June 7,
1938.

### H. P. WELCH COMPANY

*v.*

### STATE.

430

*Laurence I. Duncan* and *Robert W. Upton* (*Mr. Duncan* orally), for the plaintiff.

*Dudley W. Orr* (by brief and orally), for the State.

WOODBURY, J. The plaintiff does not contend that the legislature in enacting Laws 1933 *c.* 106, as amended by Laws 1933, *c.* 169, intended to impose direct regulations upon interstate commerce as such, nor does it contend that the provisions of these statutes operate either to discriminate against such commerce or to impose an undue or unreasonable burden upon it. *Southern Railway Co.* v. *King,* 217 U. S. 524. Neither does the company challenge the doctrine established in *Hendrick* v. *Maryland,* 235 U. S. 610, 622, and consistently adhered to ever since, (*South Carolina State Highway Dept.* v. *Barnwell Bros., Inc.* 58 Sup. Ct. Rep. 510 and cases

cited), to the effect that "In the absence of national legislation covering the subject a State may rightfully prescribe uniform regulations necessary for public safety and order in respect to the operation upon its highways of all motor vehicles—those moving in interstate commerce as well as others." As summarized in its brief, the plaintiff's appeal is "upon the ground that the statute denies to it the equal protection of the laws guaranteed by the Bill of Rights of the Constitution of New Hampshire and by the 14th Amendment to the Constitution of the United States, upon the ground that the statute and Rule 4–n, as applied to interstate commerce, have been superseded by the 'Motor Carrier Act, 1935,' upon the ground that Rule 4–n and the orders of the Commission relating thereto exceed the powers and authority of the Commission, and upon the further grounds that the evidence does not establish the Company's responsibility for the alleged violations, and that the findings and conclusions of the Commission set forth above are unwarranted by the evidence."

The statute under consideration applies only to those transporting property for hire, either as common or contract carriers as the latter term is defined in the act, and it applies to them only in so far as they operate motor vehicles over the public highways between points within this state. It does not apply to "those transporting products of their own manufacture or labor," and, in addition, section 4 of the act specifically exempts from its provisions "motor vehicles not principally engaged in the transportation of property for hire," and "motor vehicles operating exclusively within the limits of a single city or incorporated town or within ten miles of the limits thereof or motor vehicles operating beyond such ten mile limit on occasional trips, not exceeding two trips in any thirty-day period."

The company contends "that these exceptions and exemptions are discriminatory, and deny to it the equal protection of the laws guaranteed by the Constitution of New Hampshire and the Fourteenth Amendment to the Constitution of the United States."

Under Part I of the Constitution of this state and under the fourteenth amendment to the Constitution of the United States persons similarly situated are guaranteed similarlity of treatment. In this respect the fourteenth amendment "adds nothing to the rights and liberties of the citizens of this state," (*State* v. *Pennoyer*, 65 N. H. 113, 115), "for our constitution secures to every person within its jurisdiction all the rights guaranteed to citizens of the

United States by that amendment." *State* v. *Aldrich*, 70 N. H. 391. Not every legislative classification is within the ban of these constitutional limitations however. "Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment." *Barbier* v. *Connolly*, 113 U. S. 27, 32. Or, as stated in *Opinion of the Justices*, 85 N. H. 562, 564, "Classification to be valid must reasonably promote some proper object of public welfare or interest and may not be sustained when the selection and grouping is so arbitrary as to serve no useful purpose of a public nature." Legislative classification to be constitutional must be based upon some substantial foundation, it may not be arbitrary, it must be germane to the purpose of the law. *Woolf* v. *Fuller*, 87 N. H. 64, 72, 73.

Recent decisions of the Supreme Court of the United States sustain the validity under the Fourteenth Amendment of classifications substantially similar to those made in the statute under consideration. Under these decisions a state, in the interest of highway safety, may not only single out carriers for hire by motor vehicle from such carriers in general and apply to the former regulations from which the latter are exempt, but it may also create classifications among carriers for hire based upon the nature and extent of their use of the highways. *Packard* v. *Banton*, 264 U. S. 140; *Bekins Van Lines, Inc.* v. *Riley*, 280 U. S. 80; *Alward* v. *Johnson*, 282 U. S. 509; *Continental Baking Co.* v. *Woodring*, 286 U. S. 352; *Sproles* v. *Binford*, 286 U. S. 374; *Hicklin* v. *Coney*, 290 U. S. 169.

In the *Continental Baking Company* case the court said, page 373, "The legislature in making its classification was entitled to consider frequency and character of use and to adapt its regulations to the classes of operations, which by reason of their habitual and constant use of the highways brought about the conditions making regulation imperative." And, in *Sproles* v. *Binford, supra,* the court said: "There is no constitutional requirement that regulation must reach every class to which it might be applied,—that the legislature must regulate all or none. . . . The State is not bound to cover the whole field of possible abuses. . . . The question is whether the classification adopted lacks a rational basis."

These decisions establish that classifications of the sort here under consideration do not lack a "rational basis", and they are conclusive upon us on the question of the validity of Laws 1933, *c.*

106, under the fourteenth amendment to the federal Constitution. In addition these decisions "are authority to be weighed" on the question of the validity of that statute under the Constitution of this state. *State* v. *Pennoyer*, 65 N. H. 113, 115.

One of the expressed and evident purposes of the statute before us is to protect the users of the highways of this state from the dangers likely to result to them from the operation thereon of trucks under the control of drivers suffering from the effects of fatigue. Undoubtedly this is a legitimate exercise of the state's police power, and, while it is true that a fatigued truck-driver transporting goods manufactured by him or his employer is as great a menace upon the highway as such a driver transporting property for hire, it does not follow that in the interest of highway safety no distinction may be drawn between them on the basis of the industry in which they are engaged. The legislature may well have been in the possession of facts indicating a practice on the part of carriers for hire to employ their drivers for long hours, while it may also have had before it evidence that such was not the practice among the owners of trucks used for other purposes. We may take judicial notice of the fact that trucks not used by common or contract carriers create a substantial amount of traffic over the highways but we cannot take judicial notice of the conditions of employment in those industries. In other words, instances of the employment of truck-drivers for excessive hours may occur only sporadically and then under circumstances of emergency in industries of this latter sort, while excessive hours of service may be a regular practice in the business of transporting goods for hire. At least, upon the basis of facts judicially known, we cannot say that the existence of such a situation could not have been found by the legislature, and under these circumstances its classification must be allowed to stand. *South Carolina State Highway Dept.* v. *Barnwell Bros., Inc.*, 58 Sup. Ct. Rep. 510.

Similar considerations support the exemption from the provisions of the act of "motor vehicles not principally engaged in the transportation of property for hire." Excessive hours of employment on vehicles so used may either be of such infrequent occurrence that regulation of them is unnecessary, or else it may have been the legislative judgment that regulations adequate to control persons regularly engaged in the business of common and contract carriers for hire by motor truck would bear upon persons not regularly so engaged with a weight disproportionate to any possible benefit which might thereby accrue to the public. Whether, under our Constitu-

tion, frequency and extent of operation may alone provide a sufficient basis for classification we do not undertake to say, but they may properly be supporting reasons therefor when, as here, some other reason appears in conjunction with them.

In the case of local operations, in which from necessity the periods of driving must be frequently interrupted, it may well be that fatigue does not develop as rapidly or become as great as it does in a driver subjected to the monotony incident to long and uninterrupted trips. For this reason the legislature may reasonably have decided that local operations did not require any regulation at all while regulation was imperative as to operations covering greater distances.

We are therefore unable to say that the classifications contained in the act are not germane to its purpose, that they lack a "rational basis," or that all persons in the same class are not accorded similar treatment. It follows that the act is not unconstitutional.

The case principally relied upon by the company, (*Smith* v. *Cahoon*, 283 U. S. 553), is not in point. In that case the court was called upon to consider a state statute purporting to regulate carriers of property for hire by motor trucks in the interest of highway safety which excluded from its operation motor vehicles used to transport agricultural and dairy products and fish and oysters. In holding this classification arbitrary, without relation to the purpose of the act and hence unconstitutional, the court said: "But in establishing such a regulation, there does not appear to be the slightest justification for making a distinction between those who carry for hire farm products, or milk or butter, or fish or oysters, and those who carry for hire bread or sugar, or tea or coffee, or groceries in general, or other useful commodities."

The distinction between the case cited and the one at bar is obvious. In the former, classification is based upon the kind of goods carried, and that without relation to the nature of those goods as inflammable, explosive, bulky or otherwise likely to create a hazard when in transit over the highway. In the case before us, on the other hand, the classification is upon the basis of the nature of the business of the owner of the vehicle and, as appears above, a classification upon this basis is not necessarily an arbitrary or unreasonable one. The above distinction between the *Smith* case and cases similar to the one before us was fully elaborated in *Aero Mayflower Tea Co.* v. *Commission*, 295 U. S. 285.

The company's next contention is to the effect that the state

statute has been superseded by the federal Motor Carrier Act, 1935. 49 Stat. 543.

Briefly stated the record of events is as follows: The state statute under consideration became law on May 6, 1933. The administrative rulings, Circular No. 2, referred to above became effective on August 1, 1936. The violations thereof and of the statute for which the company's registration certificates were suspended occurred during the latter part of 1936 and the first three months of 1937.

The federal Motor Carrier Act, 1935, became law in August 1935, and in that act, s. 204 (a) (2), it is provided that the Interstate Commerce Commission "may establish reasonable requirements with respect to . . . . maximum hours of service of employees." Pursuant to this permissive power that commission held hearings at various places during the year 1937, and on December 29 of that year rendered its decision. In this decision it established maximum hours of service for employees of both common and contract carriers for hire by motor vehicle which are substantially similar to those established in Laws 1933, c. 106, s. 8, and in addition it provided for the keeping and filing of records of service by such employees which are also substantially similar to the provisions of Rule 4N mentioned above. By order of the Interstate Commerce Commission its requirements in the above respects were not to become effective until July 1, 1938.

The violations of the state act for which the company was put upon trial occurred, therefore, during the interval between the passage of the federal act and action thereunder by the Interstate Commerce Commission. The question presented is whether or not, during that time, the operation of the state statute, as it affected interstate commerce, was suspended by the federal act.

Generally stated the rule is that reasonable non-discriminatory state action under the police power may indirectly affect interstate commerce, but it may affect such commerce only until Congress in the exercise of its plenary power takes action which covers the field. *Oregon &c. Co.* v. *Washington,* 270 U. S. 87. Both the state and the federal government cannot occupy the same field at the same time, (*University Overland Express Co.* v. *Griffin, ante,* 395 and cases cited), and the time when Congress preëmpts the field depends upon its intention.

Applying this rule of congressional intention the Supreme Court of the United States in *Northern Pacific Railway* v. *Washington,* 222

U. S. 370, and *Erie Railroad Co.* v. *New York*, 233 U. S. 671, held that state regulations of the hours of service of train crews, in so far as they applied to employees upon trains moving in interstate commerce, were suspended upon the date of passage of a federal statute upon the subject. This federal statute was passed on March 4, 1907, but by its terms it was not to take effect until one year later. In holding that the state statutes were ineffective as to interstate commerce during that year the court said that Congress had manifested its intention to enter the field when it enacted the statute and that by postponing its effective date for a year it manifested an intention that the field should remain without regulation during that time.

The above cases are strongly relied upon by the company but we do not consider them to be in point. The reason for this is that the hours of service act, (34 Stat. 1415), differs radically from the motor carrier act, 1935. In the former Congress established the maximum hours of service permitted and provided that the act should become operative one year from the date of its passage. In the latter, Congress gave the Interstate Commerce Commission permission to fix the maximum hours of service and provided no date upon which the commission was required to put its rulings into effect. The cases establish that this difference is a material one.

In *Missouri Pacific Railway Co.* v. *Larabee Mills Co.*, 211 U. S. 612, 623, it is said that "the mere grant by Congress to the commission of certain national powers in respect to interstate commerce does not of itself and in the absence of action by the commission interfere with the authority of the State to make those regulations conducive to the welfare and convenience of its citizens." In *Northwestern Bell Tel. Co.* v. *Commission*, 297 U. S. 471, it was held that state regulations in respect to depreciation rates for property used by a telephone company in interstate commerce were not suspended by a federal statute giving the Interstate Commerce Commission authority to prescribe such rates "as soon as practicable." The court said, page 478, "The statute did not envisage an immediate adoption of depreciation rates by the Interstate Commerce Commission. A long period might elapse, as the event has shown, before the Commission would be prepared to act. It cannot be supposed that Congress intended by the amendment to § 20 (5) to preclude all regulation, state and national, of depreciation rates for telephone companies, for an indefinite time, until the In-

terstate Commerce Commission could act administratively to prescribe rates." See also *Smith* v. *Company*, 282 U. S. 133.

Upon the authority of the cases last cited we hold that it was not the intention of Congress to enter the field of regulation of hours of service of truck-drivers engaged in interstate commerce until the effective date of the Interstate Commerce Commission's rulings upon the subject. Whether that date was December 29, 1937, when those rulings were made, or whether it will not be until July 1, 1938, when they will go into effect, is a question not presented in the case at bar and one upon which we express no opinion. The violations of the state act charged against the company occurred before either of those dates and so at a time when the state act was in full force and effect. This same result has been reached as to other similar regulatory features of the Motor Carrier Act, 1935. *L. & L. Freight Lines, Inc.* v. *Commission*, 17 Fed. Supp. 13; *Werner Transp. Co.* v. *Hughes*, 19 Fed. Supp. 425.

The company further contends that the commission is without statutory authority to promulgate rules and regulations for the enforcement of the act and that in consequence it cannot be punished for failure to conform to the provisions of Rule 4N of Circular No. 2 of the Administrative Rulings referred to above.

The act does not in terms give the Public Service Commission authority to prescribe rules and regulations for the carriers to which it applies. A study of the act as a whole, however, makes it abundantly clear that the legislature intended to commit the enforcement of its provisions to the commission. In addition, the section of the act which limits hours of service (*s.* 8), specifically provides that "The commission shall have authority to enforce the provisions of this section," and section 12 provides a punishment by fine for "violating the orders of the commission issued under the provisions of this act." These provisions taken together and considered in the light of the general scheme of the statute and the rule-making power given to the commission in other phases of its activities, lead to the conclusion that although the commission is "an agency of limited powers and authority," (*Petition of Boston & Maine Railroad*, 82 N. H. 116) it was the legislative intention that the commission should enforce the provisions of this statute in the same way that it enforced its supervisory authority in other respects, *i. e.* by the promulgation of appropriate rules and regulations.

To construe the sentence quoted from section 8 otherwise than as above would be to hold that it gives to the commission only such

powers of enforcement as are given by the general law to police officers. To say the least it seems unlikely that such was the intention of the legislature.

Rule 4N, after paraphrasing the provisions of section 8 of the statute, requires that each driver shall keep with him while on duty a record of his hours of service on forms prescribed by the commission, and that copies of such records shall be kept by his employer. It also provides that these records shall be filed with the commission at the end of each month. These rules do not attempt to establish any broad "policy and standard for action," (*Ferretti* v. *Jackson*, 88 N. H. 296, 304; *Opinion of the Justices*, 88 N. H. 497), and so do not amount to an unconstitutional usurpation of legislative power by the commission. The rules are well calculated to aid the commission in the enforcement of the act and are a valid exercise by the commission of the powers given to it by the statute.

The company's next contention is that the Public Service Commission exceeded its statutory authority in suspending the company's registration certificates for violation of the commission's administrative rules. A sufficient answer to this contention is that it does not appear that the commission's order of suspension was based upon such violations rather than upon a violation of the statute itself.

The statute, (*s.* 11), gives the commission authority to suspend certificates of registration for violation of the provisions of the act. Section 12 as amended by Laws 1933, *c.* 169, *s.* 2, imposes a fine of not more than one hundred dollars for violation of "the provisions of this act or the orders of the commission issued under the provisions of this act." We need not consider the question of the power of the commission to punish under this latter section because it has imposed no fine. Instead it has suspended the company's certificates of registration. This is one of the punishments prescribed by the act for its violation and authority to suspend was clearly granted to the commission. Suspension of registration certificates is not a punishment provided for violation of the rules of the commission, and while there is evidence that the plaintiff had violated both the act and the administrative orders, there is nothing to show that the commission based its order of suspension upon a violation of the latter rather than upon a violation of the former. To assume without evidence that it had disobeyed the statute by imposing the suspension for a violation of its orders rather than for a violation of the act would be to assume that the commission had disregarded

the clear wording of the statute. This is an assumption we are not compelled to make.

It is established law in this jurisdiction that, in the absence of indications to the contrary, a general finding includes a finding of all the special facts necessary to sustain it. *Spaulding* v. *Mayo*, 81 N. H. 85; *Bean* v. *Quirin*, 87 N. H. 343, 350, and cases cited. We see no reason why this principle applicable to the findings of inferior courts is not also applicable to the Public Service Commission when acting judicially, and, applying it to the order of the commission before us, we conclude that the suspension of registration which the commission imposed upon the company was for the violation by it of the provisions of the statute and that its violations of the administrative orders were either not found or were permitted to pass without punishment.

The evidence before the commission of the company's violation of the statute by requiring or permitting its drivers to operate its trucks for illegally excessive hours was in the form of reports filed under the provisions of Rule 4N by a few of the drivers. The company does not, nor may it, complain of the informality with which this evidence was presented. P. L. c. 238, s. 10; *State* v. *Company*, 86 N. H. 16, 31. Its complaint is that this evidence provides an insufficient basis for the order of suspension for the reason that it does not show that the company "required or permitted" its drivers to operate for excessive hours; that it does not show that driving in excess of the statutory limits occurred in New Hampshire rather than in other states in which the drivers served; and that it fails to reveal that such excess hours of operation did not occur under circumstances of emergency or upon a truck under the control of two licensed operators.

The evidence contained in the reports on file with the commission show not only periods of employment for longer hours than the statute permits, but they also show repeated instances of such excessive hours and the oral testimony given before the commission by the company's local manager showed that the drivers were paid on an hourly basis. Under these circumstances it would be little short of preposterous to say that the company had no knowledge of the hours of its drivers' employment. It would be equally preposterous to find that the drivers when operating over the statutory limits were acting outside the scope of their employment; that they were engaged upon a frolic of their own. The obvious inference from the testimony is that the company not only permitted but also even

arranged its trips so as to require that its drivers serve beyond the statutory limit of hours of service.

Proof that some of the company's drivers operated for hours in excess of the statutory limit in this state is contained in the inferences which may be drawn from their reports. These reports indicate that some of the drivers lived in Manchester and that their tours of duty after excessive hours of operation ended there. Obviously to have completed such a period of service within this state they must of necessity have operated illegally within its borders. The fact that some of the hours of service which went to make up the statutory limit occurred outside the state is not material. There is no violation of the statute until an operator has reached the limit of hours of operation allowed. The offense consists in operating thereafter, and such violation could findably have occurred within the State.

The other respects noted above in which it is claimed that the evidence is deficient relate to matters peculiarly within the company's knowledge. If such facts existed it was the province of the company to offer evidence of their existence, (*State* v. *Foster*, 23 N. H. 348; *State* v. *Lapointe* 81 N. H. 227; *State* v. *Bozek*, 81 N. H. 277), and full opportunity was given to it to do so.

Since the days specified for the suspension of the company's certificates have passed, the commission may amend its order by specifying other days upon which its order of suspension shall be operative.

*Appeal dismissed.*

All concurred.