Argued March 21, reversed June 30, 1950

# PACIFIC TELEPHONE AND TELEGRAPH CO.
## *v.* FLAGG
### 220 P. (2d) 522

In Banc.

*Fletcher Rockwood* argued the cause for appellant. On the brief were Paul L. Boley and Hart, Spencer, McCulloch, Rockwood & Davies, of Portland.

*E. L. Graham,* Assistant Attorney General, of Salem, argued the cause for respondent. With him on the brief were George Neuner, Attorney General, and Max L. McMillin, Assistant Attorney General, of Salem.

*Alexander G. Brown,* City Attorney, of Portland, and Marian C. Rushing, Deputy City Attorney, of Portland, filed a brief as amici curiae.

LUSK, C. J.

The Pacific Telephone and Telegraph Company, a corporation, (Pacific) commenced three suits pursuant to the provisions of the Uniform Practice Act of the Public Utilities Commissioner, § 112-4,119, O. C. L. A., for the purpose of obtaining decrees declaring invalid, and enjoining the enforcement of, certain orders of the public utilities commissioner which rejected items of proposed expenditures by Pacific under its so-called

license contract with American Telephone and Telegraph Company, a corporation, (American) for the years 1948 and 1949, and prescribed the conditions under which payments for services rendered to Pacific by American may be made. The suits were consolidated for trial in the Circuit Court, which, after a hearing, entered a decree affirming the orders except in one particular. Pacific has appealed. The appeals were consolidated for hearing in this court.

The challenged orders are, in substance and meaning, identical; and the three suits present the same question, namely, whether, in making the orders, the commissioner has exceeded the authority conferred on him by statute.

The commissioner first indicated his views upon the propriety of the license contract in an order made January 8, 1948, in a rate case involving Pacific's intrastate Oregon rates. Thereafter, in Order No. 21057, dated November 8, 1948, which is here under review, he rejected a proposed payment under the contract of $363,000.00 contained in Pacific's supplemental budget for 1948. Pacific then asked for reconsideration of the item, and this was granted. There was an extended hearing, and on March 31, 1949, the commissioner entered his Order No. 21859, which, after certain recitals, concludes with the following "Findings and Conclusions":

"I.

"That The Pacific Telephone and Telegraph Company is a California corporation duly authorized to transact business in Oregon, and is engaged as a public utility in furnishing telephone and telegraph service in the States of California, Washington, Idaho and Oregon, and through a subsidiary, in the State of Nevada.

## "II.

"That the American Telephone and Telegraph Company is a New York corporation, and as of December 31, 1948, owned 87.93% of the voting stock of The Pacific Telephone and Telegraph Company. That the American Telephone and Telegraph Company is therefore an affiliated interest of The Pacific Telephone and Telegraph Company as the term is defined in and by Section 112-483, O. C. L. A.

## "III.

"That with the exception of the research and development work performed by the Bell Telephone Laboratories, Inc., for the General Department of the American Telephone and Telegraph Company, the services now being rendered by Ebasco Services, Inc. to the Pacific Power & Light Company at actual cost, in all respects are generally the same as the services the Oregon area of The Pacific Telephone and Telegraph Company are now receiving from the American Telephone and Telegraph Company for which it is required to pay a percentage of its gross revenues.

## "IV.

"That there is no relationship between the actual cost to the American Telephone and Telegraph Company of rendering license services to the Oregon area of The Pacific Telephone and Telegraph Company and the payments required to be made under the license contract based upon a percentage of gross revenues.

## "V.

"That it is contrary to the public interest, the interest of The Pacific Telephone and Telegraph Company, its minority stockholders, and its rate payers in the Oregon area to permit it to continue to make percentage of gross revenue payments to the American Telephone and Telegraph Company, pursuant to the provisions of the license contract.

## "VI.

"That no showing has been made by The Pacific Telephone and Telegraph Company that justifies different treatment of its proposed payment to American Telephone and Telegraph Company of $363,000 during the year 1948 than that ordered by P. U. C. Oregon Order No. 21057.

"Now, therefore, based upon the foregoing findings, the Commissioner concludes that the provisions of P. U. C. Oregon Order No. 21057 are fair and reasonable and are in the public interest, and that said Order will permit The Pacific Telephone and Telegraph Company to pay the American Telephone and Telegraph Company the actual cost to it of any service of value to The Pacific Telephone and Telegraph Company.

"The Commissioner further concludes that the procedure of ordering or requisitioning services as required by said Order has been proven workable and practicable, and will not be burdensome or unduly time consuming to The Pacific Telephone and Telegraph Company, or the American Telephone and Telegraph Company.

"Now, therefore, based upon the foregoing findings, conclusions and the records and files herein, the Commissioner reaffirms his P. U. C. Oregon Order No. 21057 entered on the 8th day of November, 1948, and it is hereby

"ORDERED that as applied to its Oregon operations, The Pacific Telephone and Telegraph Company shall not, after January 1, 1948, pay to the American Telephone and Telegraph Company for services rendered by it to the Oregon Area of The Pacific Telephone and Telegraph Company more than the actual costs to the American Telephone and Telegraph Company of rendering said services, and that said costs do not exceed the amount such services could be obtained elsewhere or performed by its own personnel. That all such services provided for under the agreement between

it and the American Telephone and Telegraph Company that are necessary or of value to it shall be ordered or requisitioned from the American Telephone and Telegraph Company.''

Order No. 21057, referred to above, is, in substance, the same as the concluding paragraph of the foregoing findings and conclusions as are the other orders under review.

By the Circuit Court's decree that part of the orders which required Pacific to requisition services from American was eliminated as going beyond the Commissioner's authority.

Pacific is a California corporation which owns and operates a telephone and telegraph system in California, Oregon, Washington and Idaho, and, through a wholly owned subsidiary, in Nevada. It is a part of the so-called ''Bell System'', which comprises American Telephone and Telegraph Company, Western Electric Company (Western), and Bell Telephone Laboratories (Bell Laboratories), all New York corporations, and twenty-two operating companies, one of which is in Canada. American owns 87.93 per cent of the voting stock of Pacific, all or substantially all the voting stock of sixteen of the other operating companies, and substantial fractions of the voting stock of the remainder. Bell Laboratories owns and operates laboratories engaged in research in all the sciences relating to the telephone art and in the application of discoveries in the art to the practical problem of rendering telephone service. The stock of Bell Laboratories is owned 50 per cent by American and 50 per cent by Western, while 99.8 per cent of the stock of Western is owned by American. Western manufactures a substantial part of the apparatus and equipment

required by the operating companies, and acts as purchasing agent for the system in the purchase from other manufacturers for resale to the operating companies of material not manufactured or produced by Western.

The license contract had its genesis in a contract dated May 7, 1880, between National Bell Telephone Company, a predecessor of American, and Pacific Bell Telephone Company, predecessor of Pacific, under which the former, as licensor, granted to the latter, as licensee, the right to use on a lease basis telephones supplied by the licensor. The licensor also undertook to defend at its own expense patent litigation. On March 10, 1936, the then existing rights and obligations of the parties under the license contract, as they had developed during the intervening years, were reduced to writing and a memorandum agreement executed, which is the license contract in controversy save for changes in the percentages of gross revenues which Pacific agrees to pay. The agreed basis of payment at the time of execution of the contract was $1\frac{1}{2}$ per cent. On September 30, 1948, American reduced this to 1 per cent. American, however, reserved the right to restore the rate to $2\frac{1}{2}$ per cent on notice, which right had been in effect at one time prior to March 10, 1936.

The following, taken from Pacific's brief, is a concise summary of the services which American undertakes to render under the contract:

"(1) American licenses appellant to use in its territory telephones and telephonic devices, apparatus, methods, and systems covered by patents owned by American or which American has the right to use, and agrees to save appellant harmless against charges of infringement of patents which appellant so has the right to use.

"(2) American undertakes to prosecute research in the art of telephony and in the development of methods to improve telephone service, and grants to appellant the right to use all of the products of such research.

"(3) American undertakes to provide arrangements for the manufacture of telephones and other apparatus needed by appellant and for the purchase by appellant of such products at reasonable prices and at the lowest prices charged by the manufacturer thereof to others.

"(4) American undertakes to furnish to appellant:

(a) Advice in engineering, plant, traffic, commercial, accounting, legal and other matters pertaining to appellant's business.

(b) Advice and assistance in appellant's financing, and extension and improvement of its system, and in securing money on fair terms; assistance in marketing securities, and other financial support which will tend to serve the best interests of both parties.

(c) Assistance in personnel matters.

"(5) American undertakes to maintain an organization of specialists of such numbers and possessed of such skills so as to be able to perform the services which it undertakes to furnish and to relieve appellant from the necessity of attempting to perform such work for itself.

"(6) American undertakes to maintain connections between the systems of appellant and other associated companies of the Bell System."

The identical contract exists between American and the other twenty operating companies in the United States.

Following the decision of this court in *Pacific Telephone and Telegraph Company v. Wallace*, 158 Or.

210, 75 P. (2d) 942 (a rate case), affirming the decision of a three-judge court sitting in the Circuit Court for Multnomah County, 13 P. U. R. (N. S.) 337, the then commissioner, by order of February 17, 1937, approved the license contract with an affiliate under Oregon Code, 1935 Supplement, § 61-280, now § 112-482, O. C. L. A. This order incorporates by reference the evidence in the rate proceedings involved in the case just cited, together with the testimony taken subsequent to that decision. While the decision in that case did not approve the payments made to American, this was for reasons of a purely technical and procedural nature. The opinions of both this court and the Circuit Court recognized the value and necessity of the services. See, 158 Or. 270, 271, 13 P. U. R. (N. S.) 389.

The statute under which the commissioner acted, and which he claims is the source of his authority to make the orders under review, is § 112-481, O. C. L. A., as amended by Ch. 132, Oregon Laws, 1945, and, so far as here pertinent, reads:

"The commissioner shall have the right and power of regulation, restriction and control over the budgets of expenditures of public utilities * * * as to all items covering or contemplating any payment or payments to any person or corporation having an affiliated interest, for service, advice, auditing, associating, sponsoring, engineering, managing, operating, financing, legal or other services. On or before the first day of November of each year each public utility shall prepare a budget showing the amount of money which, in its judgment, shall be needed during the ensuing year for covering all of such activities and expenditures, and file with the commissioner of public utilities for his investigation and approval or objection, as hereinafter provided. When any such budget has been

filed with the commissioner of public utilities he shall examine into and investigate the same to determine whether each and all of the expenditures are fair and reasonable and not contrary to public interest, and within 60 days thereafter file his finding and order approving or rejecting the same or any part thereof * * *.

"Adjustment and additions to such budget expenditures may be made from time to time during the year by filing supplementary budget with the commissioner of public utilities for his investigation and approval, and the commissioner shall have 30 days to investigate the same and file his finding and order of approval or rejection to each item or part thereof. Such examination, investigation, and determination by the commissioner of public utilities shall not bar or estop him from later determining whether any or all of the expenditures made under the budget are fair, reasonable and commensurate with the service, material, supplies or equipment received.

"The commissioner shall be empowered to prescribe the application and the necessary rules and regulations to place this section in operation.

"Any finding and order made and entered by the commissioner, as herein provided, shall have the effect of prohibiting any such unapproved or rejected expenditure from being recognized as an operating expense or capital expenditure in any rate valuation proceeding or in any proceeding or hearing unless and until the propriety thereof shall have been established to the satisfaction of the commissioner, and any such finding and order shall be and remain in full force and effect, unless and until the finding and order of the commissioner with respect thereto has been vacated and set aside in a suit brought and prosecuted as provided in sections 112-454 to 112-458, inclusive, or unless and until modified or set aside by the commissioner.

"However, nothing in this act contained shall prevent the commissioner from at any time making and filing orders, rejecting imprudent and unwise expenditures or payments, and such orders when so made shall be in full force and effect, and it shall not have the right to make such expenditures or payments found to be imprudent or unwise until the same has been vacated or set aside, as provided in a suit brought and prosecuted as provided in sections 112-454 to 112-458, inclusive, or unless and until modified or set aside by the commissioner."

The first question for determination relates to the scope of judicial review in this case. The transcript of testimony taken before the commissioner consists of 1063 pages. There were received in evidence forty-five exhibits, most of them introduced by Pacific, and some consisting of several hundred printed pages. Much of this testimony and many of the exhibits were designed to show that the services under the contract were necessary and valuable to Pacific, and that the amount in dollars which Pacific proposes to pay American for them is less than the amount in dollars which it cost American to render them.

The commissioner did not attempt to meet this evidence except by cross-examination. The commissioner's brief says "that at no time has the commissioner questioned that the services rendered by American to Pacific are of value." It is argued in the brief, however, that the representations of Pacific as to the cost of the services "are of *amounts spent* by American rather than cost to American." Particular items of this cost, namely, federal taxes paid by American on dividends it receives from stock owned by it in the operating companies, and the cost of maintaining funds

available to Pacific to meet its financial needs, are criticized, as is American's failure to credit Pacific with the amount of royalties received by American on the patents it holds. Further, the amicus curiae brief attacks the inclusion of Bell Laboratories costs paid by American as a part of its license contract expense, and the so-called "holding company" expenses of American, such, for example, as expense of its Treasury, Executive and Accounting Departments.

The commissioner has made no findings upon these issues.

There are findings that, with the exception of the research and development work done by Bell Laboratories, the services now being rendered by Ebasco Services, Inc., to the Pacific Power and Light Company are generally the same as those which Pacific receives from American; that there is no relationship between the actual cost to American of rendering license service to Pacific and the percentage payments to be made under the license contract; and that it is contrary to the public interest, the interest of Pacific and its minority stockholders and its rate payers for Pacific to make these payments. There is also what possibly might be considered a general finding in the reference to Order No. 21507, which disapproves the expenditures under the license contract. But the commissioner has not found that the services, or any of them, are unnecessary or that Pacific has failed to prove that the proposed expenditures do not exceed the cost to American of rendering the service. Nor are there findings that the services could be obtained elsewhere at less than their cost to American, or could be rendered by Pacific's own personnel more economically and efficiently, if at all. Finding No. III with

reference to services rendered to Pacific Power and Light Company by Ebasco Services, Inc., "at actual cost", says nothing as to the relative efficiency or economy of the services as between Ebasco and American, or as to whether this actual cost, if the services were obtained elsewhere, would be less than Pacific proposes to pay to American.

It is provided by § 112-481, O. C. L. A., as amended, that, after a budget has been filed, the commissioner "shall examine into and investigate the same to determine whether each and all of the expenditures are fair and reasonable and not contrary to public interest, and within 60 days thereafter file his finding and order approving or rejecting the same". Section 112-4,1116, which is part of the Uniform Practice Act, provides with respect to hearings:

> " * * * After the completion of the taking of evidence, and within a reasonable time, the commissioner shall prepare and file findings of fact and conclusions of law upon the evidence received in said matter and shall make and file his order thereon."

This requirement is by § 112-4,113 made to "apply to and govern *all hearings upon any matter or issue* coming before the commissioner *under any act by him to be administered,* whether instituted on the application, petition or complaint of others or initiated by the commissioner * * * " (Italics added.)

We said in *Pierce Freight Lines v. Flagg,* 177 Or. 1, 38, 159 P. (2d) 162:

> " * * * The procedure thus outlined recognizes the commissioner as the fact-finder, and deems his action as administrative. In other words, the facts in matters of this kind are found, not by the judge,

but by the commissioner. The commissioner's findings are binding upon the court, in the event of judicial review, if supported by cogent, competent, material and substantial evidence."

See, also, *Butcher v. Flagg,* 185 Or. 471, 203 P. (2d) 651, and *Warren v. Bean,* 167 Or. 116, 125, 115 P. (2d) 167.

In *Smith v. Illinois Bell Telephone Co.,* 282 U. S. 133, 157, 75 L. ed. 255, 51 S. Ct. 65, a rate case in which one of the questions was as to the propriety of payments made under the license contract, the Supreme Court sent the case back for further findings, saying:

" * * * In view of the findings, both of the state commissions and of the court, we see no reason to doubt that valuable services were rendered by the American Company, but there should be specific findings by the statutory court with regard to the cost of these services to the American Company and the reasonable amount which should be allocated in this respect to the operating expenses of the intrastate business of the Illinois Company in the years covered by the decree."

Upon the authority of that case a like course was taken in Petition of New England Telephone and Telegraph Co., 115 Vt. 494, 66 Atl. (2d) 135.

Referring to a similar situation, Chief Justice Hughes, in *Florida v. United States,* 282 U. S. 194, 75 L. ed. 291, 51 S. Ct. 119, said:

" * * * In the absence of such findings, we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit. The Commission is the fact-finding body and the Court examines the evidence not to make findings for the Commission but to ascertain whether its findings are properly supported."

Among the more recent decisions of the Supreme Court of the United States which deal with this subject is *Colorado-Wyoming Gas Co. v. Federal Power Commission*, 324 U. S. 626, 89 L. ed. 1235, 65 S. Ct. 850, a rate case arising under the Natural Gas Act of 1938. In remanding the case for further findings the court, speaking through Mr. Justice Douglas, said:

"The review which Congress has provided for these rate orders is limited. Sec. 19(b) says that the 'finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.' But we must first know what the 'finding' is before we can give it that conclusive weight. We have repeatedly emphasized the need for clarity and and completeness in the basic or essential findings on which administrative orders rest. Florida v. United States, 282 U. S. 194, 215; United States v. Baltimore & Ohio R. Co., 293 U. S. 454, 464; United States v. Chicago, M., St. P. & P. R. Co., 294 U. S. 499, 504-505, 510-511; United States v. Carolina Carriers Corp., 315 U. S. 475, 488-489. Their absence can only clog the administrative function and add to the delays in rate-making. We cannot dispense with them for Congress has provided the standards for judicial review under this Act. § 19(b). The courts cannot perform the function which Congress assigned to them in absence of adequate findings. Nor are they authorized under § 19(b) to make findings and substitute them for those of the Commission."

See, to the same effect, 146 A. L. R. 235, and cases there cited.

Although the commissioner's brief lays much emphasis upon the duty of this court to affirm the findings of the commissioner where they are supported by substantial evidence, it need hardly be said that we cannot either affirm or disaffirm findings

which were never made. "The courts cannot perform the function which (the legislature) assigned to them in absence of adequate findings". *Colorado-Wyoming Gas Co. v. Federal Power Commission,* supra.

■ Nor can we say that the general finding disapproving the budgets includes a finding of all the special facts necessary to sustain it. See 146 A. L. R. 235; 42 Am. Jur., Public Administrative Law, 501, § 151; *H. P. Welch Co. v. State,* 89 N. H. 428, 199 Atl. 886, 120 A. L. R. 282. An implication of that sort may not be indulged where the record indicates a contrary intention. When the findings and the orders of the commissioner are examined in the light of the entire record, the evidence introduced on behalf of the commissioner, the recitals which preceded the findings, the findings themselves and the argument in the commissioner's brief, it is manifest that the commissioner chose deliberately to ignore the evidence as to the necessity of the services and their cost. All this may be summed up in the statement in the commissioner's brief that the orders here "only denied payment *by a method* found to be contrary to the public interest." The testimony of Mr. J. L. Kennedy, chief accountant in charge of the commissioner's department of finance and accounts, who is the principal proponent on the commissioner's staff of the ideas embodied in the order, fully supports this statement, for he testified on cross-examination that the dollars of operating expense in Oregon were not of primary concern to him but the method of determining the number of dollars to be paid is the important thing.

■ The issues to which we have referred, all relating to the value, necessity and cost of the services are

basic; but in the absence of findings upon them, we are not authorized to review them.

The decisive question, therefore, is whether the challenged orders transcend the commissioner's statutory authortiy.

The purpose of the budget statute is to enable the commissioner to safeguard the rate payers and the utility against improper payments to an affiliate for services of the kind covered by the license contract. To that end he is charged with the duty of determining whether "the expenditures are fair and reasonable and not contrary to public interest." A determination by him shall not "bar or estop him from later determining whether any or all of the expenditures made under the budget are fair, reasonable and commensurate with the service, material, supplies or equipment received". Construing the statute as a whole, as we are bound to do (*City of Portland v. Duntley,* 185 Or. 365, 203 P. (2d) 640), and, having in mind constitutional limitations against granting unfettered authority to administrative officers (*Van Winkle v. Fred Meyer, Inc.,* 151 Or. 455, 49 P. (2d) 1140), we hold that the legislature did not intend to authorize the commissioner to base his determination on his own personal notion of the propriety or wisdom of proposed expenditures or of the public welfare, but that he is to be guided by the standards of fairness and reasonableness and whether the expenditures are "commensurate with the services". The legislature no doubt had in mind the prevention of "exploitation of operating companies" by affiliates. See Harv. L. Rev. 957, 981. If the operating company receives from an affiliate services that are necessary and valuable, at no greater price than the cost to the affiliate, or at a price not

in excess of that for which the services could be obtained elsewhere or could be performed by the company itself, it is not apparent that the commissioner is authorized to disallow payments for such services.

Pacific justifies the contract under which it and the other operating companies agree to pay a percentage of their gross revenues to American for identical services by the claim that, since the companies are engaged in a common enterprise having common problems, it is the most economical and efficient way of receiving such services, and, as to some of them at least, the only practicable way. Pacific also emphasizes the need of a continuing service. For example, it is the beneficiary under the contract of discoveries recently made and presently being applied in new apparatus and equipment as the result of many years of research by Bell Laboratories. It contends that it would not be practicable to order or pay for a specific part of such service at cost in the sense of the commissioner's orders. It makes an impressive showing in the evidence of remarkable progress in the telephone industry under this system. Extended reference to the evidence is deemed unnecessary, but the following from the testimony of Mr. Keith S. McHugh, a vice president of American, in support of his statement that "the telephone business has one characteristic which I believe is unique", illustrates graphically the thesis of Pacific that there must be a centralized agency for the furnishing of continuous services such as those covered by the license contract:

"* * * The operating plan of the telephone companies is, in fact, one single instrumentality, which operates as a unit simultaneously and continuously in every part of the United States. Thus,

if a man in Portland, Oregon, wishes to converse with a man in Portland, Maine, the entire plant of the American Company and the associate companies is immediately available to him and can be actuated simply by lifting his receiver in Portland, Oregon. That plant, which, for the illustrative call, would include plant owned by The Pacific Company, the Long Lines Department of the American Company, and plant of the New England Telephone and Telegraph Company, must on that call work as a unit, and every part of that plant must be designed to function as a unit. There is no similar problem, so far as I know, in any other public utility service, or, for that matter, in any other industry."

There seems to be no serious contention on the part of the commissioner that there is any agency anywhere better equipped to render these services than American, or that there is any other agency anywhere that is equipped to furnish some of the services at all, as, for example, the scientific research work pertaining to the art of telephony, or to maintain connections between the systems of Pacific and the other operating companies of the Bell System.

The requirement of the orders that Pacific requisition the services is now out of the case, as the Circuit Court held that provision invalid and the commissioner has not appealed. What is left is the disapproval of the budgets and the direction that Pacific shall not pay to American more than the "actual cost" to American of rendering such services, and that "said costs do not exceed the amount (for which) such service could be obtained elsewhere or performed by its own personnel." The evidence and the argument of counsel reveal that by "actual cost" is not meant cost to American, as established by the evidence, for all the services

in one package to all the operating companies, and then apportioned among the companies and to the Oregon area of Pacific, but specific costs of services rendered to Pacific, individually, instead of as a sharer with the other operating companies of a common service rendered to all of them as constituent parts of the Bell System. The method ordered by the commissioner appears to have for its model that pursued by Ebasco Services, Inc., which renders services on requisition to companies making up the Electric Bond and Share group and other corporations in the electric light and power industry and to many other organizations. Practically all the evidence introduced on behalf of the commissioner dealt with Ebasco's services, how they are requisitioned, and their cost determined. While we do not consider the point decisive, the evidence hardly justifies the finding that, with the exception of the research and development work performed by Bell Laboratories, Ebasco services "in all respects are generally the same" as American services to Pacific. One respect in which they are materially different is that only 2.05 per cent of Ebasco services is group services, while 97.95 per cent is specific service. On the other hand, there is convincing evidence that over 90 per cent of service under the license contract is group service. Moreover, the problem of the telephone companies in contracting for such services is quite different from that of those in the electric industry. It was conceded on cross-examination by Mr. Will T. Neill, vice president of the Pacific Power and Light Company, who testified at length as to Ebasco methods, that there is nothing in the electric industry which makes it essential to the giving of efficient service by his company that its plant be in any way coordinated

with the plant of a similar company in another part of the country. Obviously, a high degree of coordination among the operating companies of the Bell System is absolutely essential.

■ To sustain the commissioner's orders we would have to say that the legislature has empowered him to disallow proposed expenditures, notwithstanding they are shown to be for necessary services and reasonable in amount, because he disapproves, not the "expenditures" but the method by which the services are contracted for. We would have to say, further, that the commissioner is empowered to prescribe the terms on which the utility may contract for such services. This would be an interference with the powers of management incident to ownership, which, regardless of the constitutional question raised by counsel for Pacific (see *Missouri ex rel Southwestern Bell and Telephone Company v. Public Service Commission*, 262 U. S. 276, 67 L. ed. 981, 43 S. Ct. 544, 31 A. L. R. 807), we are not at liberty to hold was authorized by the legislature in the absence of a clear expression of that intent. It would have been a simple matter to confer the asserted power in plain language; we have no warrant for conferring it by interpretation.

It is argued, however, that (in the language of the findings) "there is no relationship between the actual cost to the American Telephone and Telegraph Company of rendering license services to the Oregon area of The Pacific Telephone and Telegraph Company and the payments required to be made under the license contract based upon a percentage of gross revenues." And it is said that the commissioner "only asks, and his only order has been, that he be permitted to see

the cost of rendering such service and has ordered a plan that at least should be tried before it is condemned." It is, of course, true that there is no necessary relation between the percentage payment and the cost of the service. But there is bound to be a relation between the amount in dollars of the percentage payment and the cost—it will be either greater or less or the same. The argument seems to be based on the assumption that it is impossible to ascertain the cost of services rendered under the license contract. We think it is an erroneous assumption. The commissioner's chief accountant conceded on cross-examination that where group service is rendered to a number of associated companies, the total cost of rendering the service would be spread among the recipients of the service on "some acceptable basis" and that the cost allocated to each company would be "the total actual cost allocated to the individual companies on an acceptable basis." The courts have sustained showings such as were made by Pacific in this case as to such costs. The commissioner has ample authority under the statute to hold hearings and investigate the items of a proposed budget. A determination by him does not estop him from later reopening the question and making a different determination based upon fuller information. And, as the court said in *Pacific Telephone and Telegraph Co. v. Public Utilities Commission,* (Cal.) 215 P. (2d) 441 (decided February 28, 1950), "in fixing Pacific's rates the commission may disallow expenditures that it finds unreasonable, thus insuring that any excessive costs will be met from Pacific's profits."

In *Southwestern Bell Telephone Company v. The State Corporation Commission of the State of Kansas,* decided June 10, 1950, by the Supreme Court of Kansas

and not yet reported, the court construed the following statute:

"Sec. 3. In ascertaining the reasonableness of a rate or charge to be made by a public utility, no charge for services rendered by a holding or affiliated company, or charge for material or commodity furnished or purchased from a holding or affiliated company, shall be given consideration in determining a reasonable rate or charge unless there be a showing made by the utility affected by the rate or charge *as to the actual cost to the holding or affiliated company furnishing such service and material or commodity. Such showing shall consist of an itemized statement furnished by the utility setting out in detail the various items, cost for services rendered and material or commodity furnished by the holding or affiliated company."* (Italics added.)

The commission had held that a showing of cost similar to that made by Pacific in the present case was not a compliance with the statute. The commissioner's order was set aside by the Supreme Court, which affirmed a finding of the District Court, which included this sentence: "All such costs were actual costs to American and did not cease to be actual when they were apportioned."

In Washington the Department of Public Service disallowed the license fee paid to American under the license contract. The Supreme Court of Washington set the order aside in *State v. Department of Public Service,* 19 Wash. (2d) 200, 142 P. (2d) 498 (1943). The court said that the department found "that from the evidence introduced it was impossible to ascertain the duties performed by those employees whose wages and expenses were charged in connection with the research and other matters connected with the services

performed under direction of the American Company'',
and that the department was of the opinion that ''no
definite connection was shown between the service
rendered and respondent's state of Washington opera-
tions.'' As to this the court said:

> ''* * * The record in the case at bar shows
> beyond question that, as stated by the supreme court
> in the case of Smith v. Illinois Bell Telephone Co.,
> supra, there is no reason to doubt that services
> valuable to respondent and other subsidiary com-
> panies are rendered pursuant to the license contract.
> It would be impossible for each subsidiary corpo-
> ration to itself maintain a laboratory and a staff
> of experts to render such service. The facts that
> the work is done by a central agency, and that the
> precise allocation of benefit on the one hand and
> cost on the other, cannot be apportioned among the
> respective subsidiaries with mathematical precision,
> are no good reason for the refusal of a state regula-
> tory authority to refuse to allow a utility under its
> jurisdiction to contribute, as part of its operating
> expense, a fair proportion of the cost of maintaining
> the service.''

Since the decision in 1930 by the Supreme Court in
*Smith v. Illinois Bell Telephone Co.,* supra, it has been
recognized that the utility is entitled to charge as oper-
ating expense no more than the cost of the services
rendered under the license contract properly allocable
to the telephone business involved. In addition to the
cases already cited payments under the license contract
have been approved in *Southern Bell T. & T. Co. v.
Georgia Public Service Commission,* 203 Ga. 832, 49
S. E. 2d) 38 (1948); *Alabama Public Service Commis-
sion v. Southern Bell T. & T. Co.,* (Ala.) 42 So. (2d) 655
(1949); *Southern Bell T. & T. Co. v. Railroad and Pub-
lic Utilities Commission,* 76 P. U. R. (N. S.) 101 (1948).

See, also, *Petition of New England Telephone and Telegraph Co.,* supra. We have been referred to no appellate court decision, and know of none, which refuses to uphold such expenditures when the utility has by proof established their reasonableness in accordance with the rule of the Illinois Bell Telephone Company case.

*Pacific Telephone and Telegraph Company v. Public Utilities Commission,* supra, is a decision upon substantially the same issue which this case presents. The commission, by order, found that the license contract ''was not in fact a contract but an arbitrary exaction from Pacific by its controlling parent company'', and ordered that Pacific file with the commission bi-monthly reports for the preceding two-calendar-month period showing all payments made to American ''together with an itemization of said services and the amount paid by (Pacific) for each type of service rendered''. It was further ordered that the reports should show for each type of service rendered the total cost incurred by American or its affiliates in the rendition of said service on an allocated basis segregated as to company-wide, total California and California intrastate operations. The commission claimed to find authority to make the order in statutes which empowered the commission to regulate the contracts of a utility affecting its rates and vested the commission with power ''to do all things, whether herein specifically designated or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.'' The court held that the commission had not been given jurisdiction to determine the terms on which Pacific might contract with American, saying:

''* * * The determination of what is reasonable in conducting the business of the utility is the

primary responsibility of management. If the commission is empowered to prescribe the terms of contracts and the practices of utilities and thus substitute its judgment as to what is reasonable for that of management, it is empowered to undertake the management of all utilities subject to its jurisdiction. It has been repeatedly held, however, that the commission does not have such power."

It was further said:

"In the absence of express statutory authority it has generally been held that a commission's control over contracts between affiliated corporations is limited to disallowance of excessive payments for the purpose of fixing rates (citing numerous authorities)."

■ Our consideration of this case has led us to the same conclusion as that reached by the California court. While we hold that the orders under review are not within the commissioner's statutory authority, our decision leaves the commissioner entirely free to determine whether the proposed expenditures meet the test of the budget statute as we construe its provisions.

The decree of the Circuit Court is reversed and the orders under review annulled.

----

LATOURETTE, J., DISSENTING.

The majority opinion in this case would perhaps be correct if the matter turned solely on the interpretation of Ch. 132, Or. Laws, 1945, which amends § 1 of Ch. 441, Or. Laws, 1933, relating to the power of the Commissioner to regulate, restrict and control budgets of expenditures of public utilities, but it seems to me that § 2 of Ch. 441, Or. Laws, 1933, which is § 112-482,

O. C. L. A., and a part of the law as amended, must be considered to arrive at a correct solution of the matter. For some reason, this section was not briefed, argued or urged by any of the parties to the litigation and was not considered in the majority opinion. Section 2, supra, is as follows:

"No public utility doing business in this state shall make any payment or contract to make any payment, directly, or indirectly, to any person or corporation having an affiliated interest, for service, advice, auditing, accounting, sponsoring, engineering, managing, operating, financing, legal or other services, or enter any charges therefor on its books, which shall be recognized as an operating expense or capital expenditure in any rate valuation or any other hearing or proceeding, until the propriety and reasonableness of any such payment, or contract for payment, shall have been submitted to and approved by the commissioner.

"No public utility doing business in this state shall enter into any contract, oral or written, with any person or corporation having an affiliated interest with relation to the construction, operation, maintenance, leasing or use of the property of said public utility in Oregon, or any part thereof, or for the purchase of property, materials or supplies, which shall be recognized as the basis of an operating expense or capital expenditure in any rate valuation or any other hearing or proceeding, unless and until such proposed contract has been submitted to and approved by the commissioner. When any such proposed contract has been filed with and submitted to the commissioner he promptly shall examine into and investigate the same to determine whether it is fair and reasonable and not contrary to public interest. If, after such investigation, he shall determine that it is fair and reasonable and not contrary to the public interest, he shall enter his findings and order to this effect and serve a

copy thereof upon the public utility, whereupon the contract may lawfully be recognized for the purposes aforesaid entered into. If, after such investigation, he shall determine that the contract is not fair and reasonable in all its terms and is contrary to the public interest, he shall enter his findings and order accordingly and serve a copy thereof upon the public utility, and it shall be unlawful to recognize said contract for the purposes aforesaid.

"No public utility shall issue notes or loan its funds or give credit on its books or otherwise to any person or corporation having an affiliated interest, either directly or indirectly, without the approval of the commissioner.

"The action of the commissioner with respect to each and all of the foregoing matters when submitted to him, shall be by findings and order to be entered within 90 days after the matter has been submitted to him for consideration, and the findings and order of the commissioner with respect to any of such matters shall be and remain in full force and effect, unless and until set aside by suit brought and prosecuted, as provided in sections 112-454 to 112-458, inclusive, and the public utility, or any other person or corporation affected by any such findings and order, may bring and prosecute a suit to set aside such findings and order, or any part thereof, as provided in said sections."

We see from the above that the propriety and reasonableness of the "contract for payment" must be submitted and approved by the Commissioner. We further observe that after an investigation, he has the authority, if he determines that the contract is not fair and reasonable and is contrary to public interest, to enter findings and an order accordingly, and it shall therefore "be unlawful to recognize said contract for the purposes aforesaid." The Commissioner made the following findings:

## "IV.

"That there is no relationship between the actual cost to the American Telephone and Telegraph Company of rendering license services to the Oregon area of The Pacific Telephone and Telegraph Company and the payments required to be made under the license contract based upon a percentage of gross revenues.";

and,

## "V.

"That it is contrary to the public interest, the interest of The Pacific Telephone and Telegraph Company, its minority stockholders, and its rate payers in the Oregon area to permit it to continue to make percentage of gross revenue payments to the American Telephone and Telegraph Company, pursuant to the provisions of the license contract.";

and thereafter entered the following order:

"Now, therefore, based upon the foregoing findings, the Commissioner concludes that the provisions of P. U. C. Oregon Order No. 21057 are fair and reasonable and are in the public interest, and that said Order will permit The Pacific Telephone and Telegraph Company to pay the American Telephone and Telegraph Company the actual cost to it of any service of value to The Pacific Telephone and Telegraph Company."

It is clear to me that the findings and the Commissioner's order, supra, included an attack on the license contract itself, as well as on the expenditures under the contract.

In the case of *The Pacific Telephone and Telegraph Co. v. Public Utilities Commission of State et al.,* (Cal.), 215 P. (2d) 441, cited in the majority opinion, the Supreme Court of California held the license contract

involved to be legal. One of the reasons for upholding the legality of the contract was that the law of California was not broad enough to give the Commissioner authority or power to regulate payments under the contract. However, the court said:

"Many state legislatures, not satisfied that the indirect control of payments between affiliated utility corporations through rate regulation was adequate to protect the consumer and investor from the possible abuses that could arise out of contracts between the affiliated corporations, enacted statutes specifically granting to their commissions power to regulate payments under such contracts. See, 49 Harv. L. Rev. 957, 982-989.

"* * *

"In the absence of express statutory authority it has generally been held that a commission's control over contracts between affiliated corporations is limited to disallowance of excessive payments for the purpose of fixing rates.

"* * *

"In developing a nationwide telephone service, American has adopted the legally sanctioned practice of conducting its local operations through subsidiary operating companies. It employs a method it considers reasonable in apportioning the costs of the services rendered by it to its subsidiaries among them. The contract embodying that method cannot be differentiated from other contracts by which utilities secure labor, materials, and services, except on the theory that the judgment of management is suspect on the reasonableness of expenditures in contracts with affiliated corporations as it is not in other contracts. There is no public policy against affiliated corporations, however, and the commission can treat them differently only to the extent the Legislature so provides or to the extent that they are used as a device to defeat the exercise of powers the commission has been granted. The

Public Utilities Act is silent on the question of affiliated corporations, and only the Legislature can properly decide whether they present such dangers of abuse that the commission should have broader regulatory powers over them than it now has."

There were two strong dissenting opinions in that case. I quote from that of Mr. Justice Carter:

"The question here presented is not complex. The Pacific Telephone and Telegraph Co., an operating communications utility in California, is completely dominated and controlled by the American Telephone and Telegraph Company, a New York corporation, whose main function is to hold stock in and furnish various services to local telephone operating corporations throughout the country, most of which are controlled by it through stock ownership. American enters into purported license fee contracts with its numerous affiliates, including Pacific, under which the affiliates pay a percentage of their gross revenue for the services to be rendered by American. It is conceded that in fixing rates for Pacific, our Public Utilities Commission may ignore the percentage basis of compensation under those contracts and allow only so much as is the reasonable value of such services or the cost thereof to American. The sole question is whether the commission has authority to approve or disapprove such contracts. I believe there can be no doubt of such power. It arises (1) by necessary implication, and (2) by the wording of the Public Utilities Act.

"* * * (Quotations from Harv. Law Rev. and St. Louis Law Rev. are omitted).

"Those considerations point up the vital importance of the power of the commission to disapprove such contracts as a part of rate regulation and of the necessity that the ability of the utility to serve the consumers be not impaired. I cannot believe that the Legislature intended to leave

the commission impotent to cope with those conditions. It may be that some measure of protection is afforded by the power to refuse to recognize the license fee contract when fixing rates, but having that power, it of necessity follows that they may lock the door before the horse is stolen. If they may affect the utility management indirectly by subsequent action, surely they may take precautionary measures in advance.

The Alabama Utilities Commission has pertinently observed in this connection: 'We cannot conceive that it will be contended that a Commission is without authority to halt a raid on the treasury of the operating utility on the plea that we have no right in law to manage the property. From our point of view, it is not an assertion of management, but rather an assertion of reasonable control over practices which the Commission has a right to prevent and should prevent before the injury has been done, if it is possible for us to arrive there in time.' (See, Re Southern Bell Tel. & Tel. Co., P. U. R. 1932E, 207.) Certainly it was intended that the commission would have the power incident, and indeed vital, to protect the consumer from improvident waste of funds to the detriment of the service. They surely have the power to accomplish directly that which they may do by indirection. While it may be that there is no showing in the case at bar that the payments to American here involved will seriously jeopardize Pacific's consumer service capacity, that is not necessary, for the situation is so fraught with potential and inherent dangers that this court should not overrule the commission's judgment that preventive advance action is necessary. It must be remembered that these license fee contracts are not true contracts made at arm's length or on an open market. They are between corporations, one of which is controlled by the other. As such they are subject to suspicion and therefore present dangerous potentialities. It seems plainly obvious to me that if payments for such services

are regularly supervised by the commission, it will not only inure to the consumer's benefit, but will also put the utility in the advantageous position of knowing where it stands, thus escaping the risk of making excessive payments which will not be allowed in its rate base. That the commission has such implied power is squarely declared by the Public Utilities Act. 'The railroad commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in the state and to do all things, whether herein specifically designated or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction.' (Public Utilities Act, Stats. 1915, p. 115, sec. 31; Deering's Cal. Gen. Laws No. 6386.)

"Secondly, it is clear that section 32 of the Public Utilities Act, quoted in the majority opinion, must be interpreted as empowering the commission to regulate the purported contracts here considered. The literal wording thereof requires it.

"Fear is expressed that if the instant contract is subject to approval by the commission, all other contracts or expenditures of a utility may be scrutinized in advance. Whether or not that fear is well founded is not necessary to consider. I say only that the license fee purported contract between the operating utility and its dominating father, Pacific and American, may be so treated. There is a clear difference between such arrangements and others. They are not true contracts made at arm's length. They are definitely subject to suspicion and potent with possibilities adverse to the interests of the consumers.

"It must be conceded that the contract here in question was executed by officials of Pacific who were elected by American as the principal stockholder of Pacific and owe their allegiance to American. To say that such a contract is beyond the regulatory power of the Public Utilities Commission, when it may endanger the ability of Pacific to serve its customers, is a step backward in the

public utility regulation and may open the door to abuses seriously detrimental to those dependent upon service from public utilities. While I think it is clear that the Public Utilities Act expressly empowers the commission to regulate such contracts in the public interest, there can be no question that it was the intention of the Legislature to confer upon the commission all the power necessary to protect the public interest. This, the majority overlooks in placing a strict and strained construction upon the provisions of the act in order to arrive at the conclusion reached.

"I would deny the writs and affirm the orders under review."

Since the legislature has expressly given the Commissioner the power and authority to pass on the propriety and reasonableness of the license contract herein involved and the commissioner has made a finding and has entered an order that such contract is contrary to public interest, I believe his order was legal and pursuant to law. I therefore dissent.