373 So.2d 478 (1979)
SOUTH CENTRAL BELL TELEPHONE COMPANY
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 63828.
Supreme Court of Louisiana.
June 25, 1979.
Rehearing Denied July 27, 1979.
*479 Marshall B. Brinkley, General Counsel, L.P.S.C., Baton Rouge, Michael R. Fontham, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for defendant-appellant.
*480 Norman C. Frost, Birmingham, M. Robert Sutherland, J. Robert Fitzgerald, Ronald W. Tweedel, New Orleans, Victor A. Sachse, III, Breazeale, Sachse & Wilson, Baton Rouge, for plaintiff-appellee, South Central Bell Telephone Co.
DIXON, Justice.
South Central Bell Telephone Company is a Delaware corporation, authorized to conduct business as a public utility in Louisiana. South Central Bell is one of twenty-three operating companies included in the Bell System of American Telephone and Telegraph Company (A. T. & T.), and is a totally owned subsidiary of A. T. & T. In addition to the operating companies, the Bell System includes Western Electric Company and Bell Telephone Laboratories, Inc. Western Electric manufactures, purchases, repairs and distributes apparatus and equipment as well as installs central office equipment for the System; Bell Labs engage in research, development and design work. Bell Labs also provide services for the operating companies and the long lines department of A. T. & T. South Central Bell provides both intrastate and interstate rates to customers in Tennessee, Kentucky, Alabama, Mississippi and Louisiana.
South Central Bell Telephone Company filed an application with the Louisiana Public Service Commission on April 12, 1977 to seek an increase of about $105,500,000 in intrastate rates. Before hearings were held, this court rendered its decision in South Central Bell Telephone Co. v. Louisiana Public Service Commission, 352 So.2d 964 (La.1977). On the basis of this decision, the Commission ordered a rate reduction, Ex parte South Central Bell Telephone Company, Order No. U-12785-B (Louisiana P.S.C. 1978); South Central Bell in turn increased the amount of its rate request to approximately $120,500,000. After numerous hearings, the Commission issued Order No. U-13388 which permitted an increase in gross annual revenues of $39,045,315, about one-third of the requested amount.
South Central Bell appealed this order to the district court on the basis of the record complied before the Commission. The district court on November 28, 1978 affirmed the order of the Commission except insofar as the Commission had departed from the actual capital structure of the Bell System in calculating a rate of return and had substituted a hypothetical capital structure containing less equity. The court therefore ordered an increase in gross annual revenues of $43,431,375, about $4,400,000 more than the Commission had authorized. The Commission then implemented the district court's decision but reserved its right to appeal this issue and to order refunds if it prevailed. In its answer to the Commission's appeal, the company sought review of three additional issues: the cost of equity capital set by the Commission; the amount of the attrition allowance set by the Commission; and the disallowance of certain legal expenses in antitrust litigation from the company's operating expenses.
The Capital Structure
The principal purpose of rate-making is to establish rates at a level which gives the regulated industry adequate revenues to pay its legitimate expenses and to provide a return on investment which is sufficient both to compensate present investors and to attract new capital when it becomes needed. Jones, Judicial Determination of Public Utility Rates; A Critique, 54 B.U.L.Rev. 873, 875 (1975). The utility's revenues produce a fair rate of return when this level is achieved. South Central Bell Telephone Co. v. Louisiana Public Service Commission, supra (1977). Regulation takes the place of competition in fixing rates for utilities. Utilities compete for capital, and are compensated for their product when they recover the entire cost of capital.[1]
*481 To establish whether an existing rate structure is producing adequate revenues, the agency regulating the utility first calculates the utility's revenues, expenses and investments during a test period. The total amount of the utility's investments in providing its service, including both investment in physical properties and an allowance for working capital, constitutes the utility's rate base. The utility's revenues minus its expenses, exclusive of interest, constitutes its earnings, or the return which is available for distribution to its stockholders and creditor investors. The regulating agency then determines whether the ratio of return to rate base is fair, inadequate, or excessive. 1 A. Priest, Principles of Public Utility Regulation, 45-226 (1969). The relationship may be expressed in the following formula:
rate of return = revenues minus expenses
 total investment
The generally accepted method of computing a fair rate of return is the "cost of capital" approach, in which the rate of return is determined by the utility's over-all cost for all types of capital. If this method is used to establish the fair rate of return, the utility's capital structure becomes relevant because different types of capital have different costs; a utility which employs, to a large extent, a relatively cheaper form of capital will require a lower rate of return than a company which extensively relies on a relatively more expensive form. Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431 (1957). The following figures, based on a presumed cost of debt at 7%, preferred stock at 9%, and common stock at 11%, demonstrates this interrelationship:

 COMPANY A:
 Debt 50% at 7% .0350
 Preferred 10% at 9% .0090
 Common 40% at 11% .0440
 _____
 .0880
 A fair rate of return would be 8.8%
 COMPANY B:
 Debt 35% at 7% .0245
 Preferred 10% at 9% .0090
 Common 55% at 11% .0605
 _____
 .0940
 A fair rate of return would be 9.4%
 COMPANY C:
 Debt 20% at 7% .0140
 Preferred 10% at 9% .0090
 Common 70% at 11% .0770
 _____
 .1000
 A fair rate of return would be 10%

*482 In Docket U-12785, the Commission determined that the capital structure for the unconsolidated Bell System should be used in calculating a fair rate of return rather than the actual capital structure of South Central Bell. In that case the Commission used the actual capital structure of the Bell System which at the time was composed of 49.5% debt, 4.4% preferred stock, and 46.1% common equity. The Commission's decision to calculate the rate of return on this basis was upheld by this court. South Central Bell Telephone Co. v. Louisiana Public Service Commission, supra (1977).
Since then the Bell System has significantly increased the equity portion of its capital structure to a projected 50% by the end of 1978. As a result debt has decreased to about 46.7% and preferred stock to about 3.3% of the capital structure. Moreover, counsel for the Bell System stated at the hearings that the company intended to increase its equity ratio to 55%.
The Commission accepted the testimony of Dr. Richard Lurito of the firm of David Kosh and Associates of Arlington, Virginia that the projected capital structure of the Bell System was too expensive and was unnecessary to provide the company with adequate safeguards against adverse financial conditions. Dr. Lurito explained that equity is more expensive than debt, since the equity investor demands a larger return on his investment to offset the greater risks which he undertakes. Moreover, as Dr. Lurito pointed out, interest paid on debt is deductible for tax purposes, whereas dividends are not. The Commission, therefore, accepted Dr. Lurito's recommendation that it use a hypothetical structure composed of 45% equity, 51% debt and 4% preferred stock to determine a fair rate of return.
In reversing this determination, the district court first noted that a departure from the "historical" hypothetical capital structure of 45% debt and 55% equity was permitted in the 1977 South Central Bell case. South Central Bell Telephone Co. v. Louisiana Public Service Commission, supra (1977). The district court then cited this court's observation in permitting this departure:
"... However, it does not follow that this is the only reasonable capital structure that can ever be used in determining the utility's cost of capital. Past practices should not prevent a regulatory agency from adopting in good faith new approaches and techniques in an effort to more realistically determine a rate of return fair to both the utility and the rate-payers. Perhaps several frequent changes or a new approach adopted under different circumstances would indicate capriciousness or bad faith. The instant case, however, presents the Commission's first actual change in this respect in twenty years. . . ." 352 So.2d at 972.
The district court considered the change from hypothetical structure to actual structure (of the Bell System) and back again in the instant case to be a capricious exercise of the Commission's regulatory authority. Moreover, the court remarked that there was no objective evidence to support a finding that the actual capital structure of the Bell System was unreasonable, a finding which the court evidently considered prerequisite to the Commission's using a hypothetical capital structure to determine a rate of return.
The Louisiana Public Service Commission is authorized to fix "just and reasonable" rates for public utilities. R.S. 45:1176; see La.Const. art. 4, § 21. Orders of the Commission are entitled to great weight and should not be overturned unless they are shown to be arbitrary, capricious or abusive of the Commission's discretion. Louisiana Oilfield Carriers Association, Inc. v. Louisiana Public Service Commission, 281 So.2d 698 (La.1973); Louisiana Tank Truck Carriers, Inc. v. Louisiana Public Service Commission, 244 La. 909, 155 So.2d 15 (1963). It is also well established that courts should be hesitant to substitute their views for those of the expert body performing the legislative function of setting rates, and should not disturb the Commission's decision without a clear showing of an abuse. Greater Livingston Water Co. v. Louisiana Public *483 Service Commission, 294 So.2d 501 (La. 1974); Gulf States Utilities Co. v. Louisiana Public Service Commission, 222 La. 132, 62 So.2d 250 (1952).
The authority of the Public Service Commission to establish a rate of return for a regulated utility on the basis of a hypothetical structure has been settled in Louisiana. In Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431 (1957), the court approved the Commission's determination of a fair rate of return based on a capital structure consisting of 45% debt and 55% equity, although the company's actual capital structure was 22.3% debt and 74.6% equity. Three years later, in Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372 (1960), this court again recognized the Commission's authority to calculate a fair rate of return on the basis of a hypothetical capital structure:
"The Company argues that the Commission has invaded the reasonable range of the discretion of the Company's board of directors when it in effect attempts to determine the amount of debt which the utility must incur. This same argument was made when this case was before us in Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, supra [232 La. 446, 94 So.2d 431], where we rejected the Company's contention. We pointed out that there is no prescribed formula set by the constitution or the legislature for the fixing of `just and reasonable' rates for public utilities and that the Commission therefore is given wide discretion in adopting any reasonable formula . . ." 239 La. at 199-200, 118 So.2d at 381.
In neither of these cases did this court indicate that it was incumbent on the Commission to find the company's actual capital structure unreasonable before it could set a rate of return on the basis of a hypothetical structure. Such a requirement would be anomalous, since South Central Bell is requesting the rate increase and, therefore, bears the burden of proving that the increase is justified. If the company's request for the increase is due, in part, to its capital structure, the company should also bear the burden of justifying the portion of the increase attributable to its management's choice of capital structure. The only evidence adduced by the telephone company on this issue was testimony that the corporate managers believed a 55% equity ratio to be desirable. Opposed to this were studies performed by the Kosh consulting firm which demonstrated the higher cost of a large equity ratio and the safety of a larger debt ratio (that it could withstand periods of economic adversity).
It should first be noted that any capital structure assigned to South Central Bell is, to some degree, hypothetical. South Central Bell is a wholly owned subsidiary of A. T. & T., and is an integral part of the Bell System with risks which are indistinguishable from those of the System. Its cost of equity is determined completely by the Bell System managers and investors, since its stock is issued only to the parent corporation. Since that equity is "purchased" with capital derived in part from debt and in part from the sale of stock by A. T. & T., such cost of equity is itself an "artificial" figure. These factors persuaded this court in South Central Bell Telephone Co. v. Louisiana Public Service Commission, supra (1977), to employ the capital structure of the Bell System in calculating the fair rate of return for South Central Bell; South Central's own capital structure was not considered to reflect economic reality. On the other hand, it has been argued that use of the parent's capital structure also distorts reality, since each subsidiary may be regulated by a different agency and may experience different operating and financial risks. See Fitzpatrick, Subsidiaries' Capital CostsA Compromise Approach, 99 Public Utilities Fortnightly, No. 13, p. 23 (1977). It is therefore clear that a determination of a wholly owned subsidiary's capital structure is somewhat hypothetical, even when the actual structure of either parent or subsidiary is used.
*484 As this court has also noted, the Commission has a duty to ensure that ratepayers are not penalized by management's decision to maintain a low debt ratio. Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372 (1960). When this court accepted the hypothetical structure in that case, we stressed the future benefit to ratepayers which would be attributable to that formula:
"... The philosophy of this formula is based on the proposition that there is a great savings in income taxes through the deduction of interest from earnings where there is substantial debt ratio and that it is the duty of the utility to pass this savings on to the subscribers. ..." 239 La. at 201, 118 So.2d at 381-382.
By permitting this hypothetical structure, we recognized the Commission's authority to regulate the industry as an efficient enterprise, rather than as a luxurious one, to ensure its subscribers service at the lowest rates which "enable a utility to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed." 239 La. at 200, 118 So.2d at 381. The very fact that the fair rate of return is largely based on the utility's cost of capital indicates that an efficient enterprise is the desired goal. As this court has remarked:
"... the peculiar situation of each utility, which is largely reflected in its cost of capital, dictates the level of its earnings....

. . . . .
Each company is allowed to meet its own legitimate cost of doing business, although the rate of return may vary. The relevant facts and circumstances are to be considered in order that each is given an equal footing in the competition for new capital. . . ." 232 La. at 459-460, 94 So.2d at 436.
To this end, "[t]he Commission is not required to accept uncritically for regulatory purposes the utility's corporate form or financial information. It is the agency's duty to look beyond superficialities for economic reality." South Central Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 352 So.2d at 973.
The chief objection of the company to setting the rate of return on the basis of this hypothetical structure is that its use will cause South Central Bell's bonds to be downrated, and that it will hinder the company's ability to obtain capital during periods of economic restraint. However, it is noteworthy that in 1976-1977, when the debt ratio of the Bell System was 49.5%, the company's bonds retained their AAA rating. The company's argument that its ability to acquire necessary capital will be impaired was contrary to the Commission's experience with other regulated industries. As the Commission noted: "Rarely does a large publicly-traded utility come before this Commission that has an equity ratio in excess of 40%," and yet these utilities find necessary capital for their operations. The Commission's decision to discount the company's expressed concerns on the use of the hypothetical structure is not unreasonable.
The district court also expressed concern that the Commission was acting in an arbitrary and capricious manner by "vacillating" from a hypothetical capital structure in earlier cases to the actual capital structure used in Order U-12785-B to a hypothetical structure in this order. However, this conclusion of the trial court was based more on form than substance. In 1976, when the Commission calculated the rate of return on the basis of the Bell System's actual capital structure, its structure consisted of 49.5% debt, 4.4% preferred stock, and 46.1% common equity. At the time of the present order, the Bell System had increased its equity to approximately 50% of its capital structure, with debt constituting 46.7% and preferred stock 3.3%. By employing a hypothetical structure of 51% debt, 4% preferred stock, and 45% equity, the Commission used a structure which is quite similar to the actual capital structure of the company in 1976; indeed, there is more similarity between the actual structure of the Bell System in 1976 and the hypothetical structure at issue than between *485 the actual structure of 1976 and the actual structure projected for the end of 1978. Although the Commission changed its methodology, the result of the change was to employ a capital structure similar to that used in its most recent order, U-12785-B, in an effort to overcome the effect of an increase of equity in the Bell System's capital structure. When viewed from this perspective, it is clear that the Commission did not act capriciously or arbitrarily.
The district court's decision on this issue is therefore reversed, and the Commission's determination to employ a hypothetical capital structure in setting the fair rate of return is reinstated.
The Cost of Equity
South Central Bell appealed to the district court the Commission's decision setting the cost of equity at 11%. The district court affirmed the Commission on this issue, noting that sufficient evidence was set forth in the Commission's order to support this decision.
During hearings on the requested rate increase, South Central Bell presented testimony in an attempt to show that the cost of equity was 13 to 15% or more. The company's experts testified that a 3 to 5% differential exists between the cost of debt and the cost of equity due to the increased risk assumed by the investor in equity. In addition, company experts testified that investor expectations required an annual growth rate of earnings per share in the range of 6%, which in turn militated for a cost of equity in the 14 to 15% range since the retained earnings of the Bell System were 40% (i. e., 60% of all earnings are paid out in dividends). Experts testifying for the company also produced studies which demonstrated that the average cost of equity for certain companies was in the 13 to 15% range.
Dr. Lurito testified that the base cost of equity for the Bell System was 10.75%, and recommended that this cost be used by the Commission because the present capital structure of the Bell System made sales of additional equity unnecessary in the near future. Lurito then recommended that the cost of equity be established at 11.5%, since at that cost (if the company should issue new stock) the new stock could be sold at a price above book value.
After evaluating this evidence, the Commission stated that it saw no reason to depart from the 10.5 to 11.5% range adopted in Order No. U-12785 and therefore authorized a cost of equity at midpoint in the range, 11%.
The company argues that this cost of equity creates economic confiscation, and that it will be unable to issue additional equity at a price above book value. However, the company apparently overlooks the fact that preventing the Bell System from issuing more equity, the most expensive form of capital, is a legitimate object of the Commission. The Commission at this time considers that a smaller proportion of equity and a larger proportion of debt in the company's capital structure would be more efficient, economical and safe (depression proof). We may assume that the Commission will establish a sufficient cost to allow the company to issue new equity at a price above book value when new equity issues are determined to be in the public interest.
The company also contends that the Commission arbitrarily rejected the testimony of its experts in setting this cost of equity. However, in its order, the Commission gave adequate reasons for disregarding the evidence put forward by South Central Bell. The Commission concluded that the testimony concerning the 3 to 5% differential in the cost for debt and equity was unsupported by any studies and appeared exaggerated. Nor was support given for the experts' assertions that investors expect a 6% annual growth rate of earnings per share. Finally, the Commission noted that the studies presented which showed the cost of equity in the 13 to 15% range were not conducted on companies with investment risks similar to the telephone company's. The companies were shown to have market-to-book ratios of 1.4, a ratio quite practical if the issue of additional equity is desirable, but luxurious for a regulated utility considered *486 to have too much equity in its capital structure.
On the other hand, a study prepared by Dr. Lurito used the calculated cost of equity for A. T. & T. and the six operating companies which have publicly traded stock to ascertain the appropriate cost of equity for South Central Bell. The study showed that A. T. & T. had an annual rate of growth of earnings per share of 4.25% and a 1976-1977 dividend yield of 6.44% which, when combined, indicated the cost of equity was 10.67% for the parent company. The six operating companies had an average growth rate of 3.42% and an average dividend yield of 7.42% which indicated a 10.84% cost of equity. This study was based on enterprises with risks similar to those encountered by South Central Bell, and the Commission was not unreasonable to give weight to it.
A regulatory body such as the Commission is entitled to use its own judgment in evaluating evidence concerning a matter within its area of expertise, and is not bound even by uncontradicted opinion testimony of experts. Baton Rouge Water Works Co. v. Louisiana Public Service Commission, 342 So.2d 609 (La. 1977). In the instant case the Commission relied not only on its own expertise, but also on the testimony of Dr. Lurito, who actually recommended a lower cost of equity than that granted by the Commission. Moreover, we note that numerous recent cases in several jurisdictions have set the cost of equity in the 11% range.[2] We therefore affirm the Commission's decision establishing 11% as the proper cost of equity.
The Attrition Allowance
Attrition is a decline in a utility's actual rate of return, after the test year, caused by a growth in its rate base or operating expenses (or both) which outstrips any increase in its revenues. South Central Bell contends in this case that its earnings are adversely affected by attrition and included in its rate application a request for approximately $22,000,000 to offset investment attrition. The Commission relied on a study prepared by Mr. Louiselle of the Kosh consulting firm and awarded the company an attrition allowance of $2,288,000 in addition to an allowance of $6,300,000 for certain known increases in operating expenses.[3]
*487 The study prepared by Mr. Louiselle compared past growth in revenues, expenses and rate base, and from these data drew an estimate of the company's earnings one year after the effective date of the rate increase. The statistics relied on by Mr. Louiselle showed that the company's operating income would rise, but would be surpassed by the rise in the net rate base, which would produce a decline in the rate of return from 8.71% to 8.61%. The attrition rate of .10% equals a return requirement of $1,258,000. When this last figure is divided by the tax conversion factor of .4827, the revenue requirement is increased to $2,606,000. However, since revenues were anticipated to increase by 13.88% from December 31, 1977 to April 15, 1979, Mr. Louiselle divided the last figure by 1.1388 to reach the attrition allowance fixed by the Commission, $2,288,000.
The Commission argues in brief that this method of calculating attrition was specifically approved in South Central Bell Telephone Co. v. Louisiana Public Service Commission, supra (1977). However, in that case this court accepted this method of calculating attrition because the Commission had insufficient time to evaluate the data provided to it by the company; we did not approve this method as the sole means of calculating attrition, and instead noted: "Forecasting future industrial, financial and economic trends is fraught with uncertainty, and there is no single fool-proof method for doing it." 352 So.2d at 978. The question, therefore, is whether the Commission acted unreasonably by adopting the findings offered by Mr. Louiselle and in rejecting the study prepared by the company's experts.
South Central Bell contends that its method of calculating attrition, which it deems the excessive investment methodology, has been used by the Commission in the past, and that the Commission has arbitrarily discarded that method. However, a review of the orders cited by the telephone company indicates that this methodology was employed to provide South Central Bell with sufficient funds to finance an unusually large construction program, and that the Commission never adopted this methodology to calculate attrition. See Ex parte South Central Bell Telephone Co., 4 P.U.R. 4th 301 (La. P.S.C. 1974); Ex parte South Central Bell Telephone Co., 98 P.U.R. 3d 185 (La. P.S.C. 1973).
The study offered by the company does not demonstrate that a growth in the rate base or in expenses will outstrip growth in revenues, but instead takes a portion of the investment already in the rate base which the company considers excessive and provides a double rate of return on it. Although the data provided by the company indicate that the cost of a new main station is certainly greater than the average cost for existing stations, the study fails to prove that these higher expenses will not be equaled or surpassed by higher revenues. For this reason, the Commission acted reasonably in rejecting the study offered by South Central Bell. On the other hand, the study prepared by Louiselle addressed the relevant issues for determining attrition, and the Commission was correct to rely on it in making the attrition allowance.
Disallowance of Antitrust Legal Expenses
As part of its operating expenses, South Central Bell included $17,000 which it paid to A. T. & T. for the defense of an antitrust suit brought by the Justice Department against A. T. & T. and Western Electric. Mr. Louiselle recommended that this expense be eliminated because South Central Bell was not a named defendant in the suit, and because antitrust litigation is more a risk to be borne by the shareholders of A. T. & T. than an operating cost to be borne by the ratepayers. The Commission agreed to this recommendation, and stated that A. T. & T., the sole shareholder of South Central Bell stock, should bear this expense.
Legal expenses have received conflicting treatment from different regulatory bodies. Some regulators take the position that such expenses are nonrecurring in nature and should therefore not be treated as operating expenses for rate-making purposes. In re Consolidated Edison Co. of New York, 73 *488 P.U.R. 3d 417 (New York P.S.C. 1968). Others consider legal expenses as a part of conducting business and therefore permit utilities to include these costs in the company's operating expenses. Re Fitchburg Gas and Electric Co., D.P.U. 19084 August 31, 1977. However, the company has offered no authority for its claim that the legal expenses of a parent company defending antitrust litigation are properly charged as part of the subsidiary's operating expenses. We therefore agree with the Commission's decision to disallow $17,000 in legal expenses from South Central Bell's operating expenses.
For the reasons assigned, the judgment of the district court is affirmed, except insofar as it reversed the Commission's use of a hypothetical capital structure, which is reversed. The original order of the Commission granting a rate increase of $39,045,315 is reinstated, all at the cost of South Central Bell.
SUMMERS, C. J., dissents.
MARCUS, J., concurs in part and dissents in part, being of the opinion that the judgment of the district court is correct.

On Application for Rehearing
PER CURIAM.
In its application for rehearing, South Central Bell contends that we held that the Louisiana Regulatory Commission could properly prevent the Bell system from issuing more equity.
We did not intend to so hold by the statement referred to. We did not intend to infer that the regulatory commission had any function in requiring a particular capital structure of the parent or subsidiary of a utility system, or in impeding any alteration of such structure felt desirable by their management.
The sole issue before us is whether the Louisiana rate payer served by a Louisiana subsidiary should as a matter of law be required to pay additional costs resulting from a more luxurious capital structure than required for the efficient delivery of services to the Louisiana consumer.
Our finding that the Louisiana Regulatory Commission was not arbitrary in refusing to so penalize the Louisiana rate payer is of course without prejudice to the right of the companies to adopt any capital structure deemed expedient by them. The regulatory commission is not required, however, to permit them to exact from the Louisiana rate payer the unnecessary additional costs resulting from their adoption of a capital structure which requires an unnecessarily expensive cost of acquiring capital.
The remaining contentions of South Central Bell have been adequately resolved in our original and majority opinion.
NOTES
[1] A more comprehensive explanation of the purpose of rate-making is found in the testimony given by Dr. Richard Lurito:

"In our free enterprise economy, the levels of prices and earnings are generally determined by the forces of competition. However, unlimited price competition does not work in the case of public utility pricing.
Utilities are for the most part `Natural Monopolies', in which unlimited price competition does not work and consequently tends toward monopoly. Absent such competitionthe normal regulator of both prices and earnings in our economya substitute must be found to maintain utility prices and earnings at competitive levels, a substitute that will simulate the working of competition for the utility industries.
The substitute that has been developed is regulation. The basic function of regulation is to establish the conditions under which consumers are assured of an adequate supply of good service at reasonable prices. In order to do that, regulation must provide the utility a reasonable chance of earning a fair return on its investment. If it does not, investors will shy away from utilities, and service will deteriorate, and eventually may even stop.
Thus to assure good service, regulation must make it possible for the utility to compete in the capital markets for the funds it requires. The utility's earnings, i. e., its RETURN, both actual and prospective, must be sufficient to maintain the credit of the utility so that it can attract the required capital on reasonable terms. The rate of return is but an intermediate factor; the basic requirement is a fair and reasonable dollar return.
In order to attract capital on reasonable terms, the utility most be able to pay the going price. Attraction of capital involves the same general conditions as the attraction of any other input the utility needs for efficient and successful operations; labor, materials, plant, managerial skill, etc. The utility must be able to pay the going price for these items as well as for capital. In the last analysis regulation seeks to set utility prices so that in the long run the utility can recover all of its costs, including the cost of capital.
. . . . .
The utility has the responsibility of providing good service to all who demand it, at reasonable and nondiscriminatory rates. If operating efficiently and economically, and fulfilling its public utility responsibility, the utility is entitled to every reasonable opportunity of earning a fair return. That in turn then means that regulation should so set rates that the utility can obtain a sufficient amount of revenue to cover all expenses and have enough left over to cover the cost of capital. If the utility earns its cost of capital, it can attract the required additional capital in reasonable amounts and at reasonable terms. This is the basic principle."
[2] See Re Chesapeake & Potomac Telephone Company, 4 P.U.R. 4th 1 (11%) (District of Columbia P.S.C. 1974); Re North Florida Telephone Company, 1 P.U.R. 4th 399 (10-12%) (Florida P.S.C. 1973); Re General Telephone Company of the Southeast, 9 P.U.R. 4th 99 (11%) (Georgia P.S.C. 1975); Re Pacific Northwest Bell Telephone Company, 18 P.U.R. 4th 115 (8.42-10.62%) (Idaho P.U.C. 1976); Re Northwestern Bell Telephone Company, 20 P.U.R. 4th 462 (11.2-11.5%) (Iowa State Commerce Commission 1977); Re South Central Bell Telephone Company, 12 P.U.R. 4th 426 (11%) (Kentucky P.S.C. 1975); Re New England Telephone & Telegraph Company, 13 P.U.R. 4th 65 (11-11.75%) (Maine P.U.C. 1976); Re Michigan Bell Telephone Company, 15 P.U.R. 4th 209 (10.19%) (Michigan P.S.C. 1976); Re South Central Bell Telephone Company, 5 P.U.R. 4th 113 (10%) (Mississippi P.S.C. 1974); Re Southwestern Bell Telephone Company, 18 P.U.R. 4th 27 (10.64%) (Missouri P.S.C. 1976); Re Central Telephone Company, 13 P.U.R. 4th 431 (10.46%) (North Carolina P.S.C. 1976); Re Norfolk & Carolina Telephone & Telegraph Company, 18 P.U.R. 4th 592 (11.1%) (North Carolina P.S.C. 1977); Bainbridge Motor Company v. General Telephone Company of Pennsylvania, 12 P.U.R. 4th 416 (10.12%) (Pennsylvania P.U.C. 1975); Re Southern Bell Telephone & Telegraph Company, 18 P.U.R. 4th 623 (8-11%) (South Carolina P.S.C. 1977); Re Northwestern Bell Telephone Company, 15 P.U.R. 4th 289 (11.22%) (South Dakota P.U.C. 1976); General Telephone Company of the Southeast v. Tennessee Public Service Commission, 7 P.U.R. 4th 273 (11%) (Tennessee Public Service Commission 1974); Re Chesapeake & Potomac Telephone Company of Virginia, 10 P.U.R. 4th 255 (11%) (Virginia State Corporation Commission 1975); Re Wisconsin Telephone Company, 19 P.U.R. 4th 459 (11%) (Wisconsin P.S.C. 1977); Re Mountain State Telephone & Telegraph Company, 18 P.U.R. 4th 347 (10.4%) (Wyoming P.S.C. 1976).
[3] This allowance includes: $3,249,000 for union wage increase; $716,000 for a nonunion wage increase; $815,000 for restructuring of management salaries effective September 1, 1977; $253,000 for a FICA tax increase; $604,000 for pension accrual rate increase; $367,000 for contract changes; and $296,000 for restructuring of management salaries effective January 1, 1978.