**STATE ex rel. SOUTHWESTERN BELL TELEPHONE COMPANY,
Relator-Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF MISSOURI, et al., Respondents,**

and

**James M. Fischer, Public Counsel for the State of Missouri,
Intervenor-Respondent.**

**No. WD32967.**

Missouri Court of Appeals,
Western District.

Nov. 9, 1982.

As Modified Jan. 4, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 4, 1983.

---

Jack C. Lorenz, Mark P. Royer, Edgar Mayfield, St. Louis, for relator-appellant.

Kent M. Ragsdale, Thomas R. Parker, Jefferson City, for respondents Public Serv. Com'n.

James M. Fischer, Michael C. Pendergast, Jefferson City, for intervenor-respondent.

Before KENNEDY, P.J., and WASSERSTROM and LOWENSTEIN, JJ.

WASSERSTROM, Judge.

This case involves two rate proceedings, each initiated by Southwestern Bell Telephone Company ("Bell") at different times, which were formally consolidated by the Missouri Public Service Commission ("the Commission"), and also a third proceeding denominated as a "Cost of Service Study" which was implemented for the first time by the Commission's order herein. An understanding of the issues presented by this complicated case requires a rather detailed statement of the procedural history.

On May 13, 1977, Bell filed tariffs to increase rates in the Kansas City exchange by reclassifying that exchange from Class X to XI, on the basis that the Kansas City exchange had increased in size to the point where it should be in the higher classification. Public Counsel opposed that reclassification. The Commission ordered the proposed tariff suspended and listed the proceeding with respect to this tariff as No. TR–77–214.

Very shortly thereafter, on May 27, 1977, the Commission issued its order in Case No. 18,309 directing Bell to conduct a study of cost of service and of the relative costs within rate groups. Such a study was thereupon commenced by Bell.

On February 23, 1978, all parties in interest entered into a stipulation under the terms of which rates for Class XI would go into effect for the Kansas City exchange, but subject to an agreement by Bell that it would refund any portion of the increase subsequently found to be unjust or unreasonable. The latter agreement on the part of Bell is set forth in the stipulation as follows:

"[T]he Company [Bell] by appropriate tariff filing agrees that any rates collected pursuant to these tariffs for telephone service provided within the Company's Kansas City Metropolitan Exchange shall be subject to refund if required by the final decision in this case. Any amounts collected under the Kansas City Metropolitan Exchange tariffs, in Missouri, which are in excess of the rates later determined in this case to be the just and reasonable rates for said service will be refunded by the Company to the customers who have paid the excess charges with simple interest at an annual rate of six percent. The refund provision to appear on the applicable tariff sheets is set forth in Attachment A."

The provision of Attachment A so referred to read:

"The rates collected under this tariff are subject to refund depending upon the final decision of the Missouri Public Service Commission in Case No. TR–77–214. Any amounts collected under this tariff which are in excess of the rates finally determined in that case to be the just and reasonable rates for service in the Kansas City Metropolitan Exchange will be refunded together with simple interest at an annual rate of six percent."

Bell did then file an interim tariff with the stipulated refund provision. The Commission approved this tariff, and collections thereunder began by Bell on March 6, 1978.

On April 16, 1979, Bell filed a new tariff asking for an increase in rates of $112.5 million dollars, which was suspended by the Commission and given proceeding No. TR–79213. By that time, Bell had completed the study directed in Case No. 18,309, and the conclusions reached as a result of that study had been approved by the Commission on July 7, 1978. The tariffs filed by Bell in TR–79–213 proposed to follow the new concepts established by reason of the study approved in Case No. 18,309. On motion by Bell, the proceeding under TR–79–213 was consolidated with TR–77–214 and both proceedings were set for joint hearing.

On March 3, 1980, the Commission issued its order allowing rate increases under TR–79–213 in part, and also ordering a partial refund of the interim rates collected by Bell under the stipulation in TR–77–214, during the period March 6, 1978, to March 13, 1980. After an unavailing application for rehearing before the Commission, Bell petitioned the circuit court for review. The circuit court affirmed, from which ruling Bell now appeals to this court.

Bell's brief sets out 14 points relied on, some with subpoints. Those points may be simplified and summarized as follows: (1) that the order of the Kansas City refund was improper; (2) that Bell was improperly forced to comply with interrogatories submitted by Public Counsel; and (3) that the rate of return under TR–79–213 was inadequate because of alleged errors on various accounting issues.

I.

*The Kansas City Refund*

In addition to what has already been stated, certain additional facts must now be supplied. Bell has in the past and still offers the public a wide variety of services.[1] The Commission in Case No. 18,309 divided these services into three categories. Category one services are all those subject to substantial competitive pressure. Category two services are all those which are classed as basic telephone service. Category three is made up of the balance of all services provided by Bell.

The basic telephone service (now considered Category two services) have in turn been subdivided into groups in accordance with size. At the time of the institution of TR–77–214 those groups (sometimes referred to as "exchanges") were eleven in number. These groups were ranked in accordance with its number of telephone "Exchange Access Arrangements" ("EAA").[2]

Any exchange with 550,000 or more EAAs was classified in Rate Group XI, which was the highest classification. An exchange having a greater number of EAAs provided greater opportunity for service to the customers in that exchange because there were more phones which could be called without special charge, and this additional service required the employment of more complex equipment. Because of this, the rates have been greater in the higher groups than in the lower numbered groups.

The conclusions reached as a result of the study in Case No. 18,309 were as follows: (1) Category one services should be priced to provide the maximum possible contribution. Category three services are also to be priced to provide a substantial contribution. The basic local exchange service, Category two, should bear only that remaining portion of the revenue requirement which cannot be obtained from Category one and Category three services. In other words, Category two is to be the beneficiary of residual pricing. (2) In the past, the local exchanges in the higher classifications have been assigned rates which resulted in a higher percentage of recovery of embedded costs than was true of the smaller local exchanges. Therefore, in setting future rates, the relative charges should be readjusted between groups so as to give relief to the larger exchanges, particularly the metropolitan areas of St. Louis and Kansas City. (3) The number of local telephone exchanges should be reduced from eleven to four. Bell formulated the tariff submitted in TR–79–213 in light of those conclusions.

The general approach indicated by those conclusions was followed by the Commission in this case. Accordingly, the Commission first set about to determine how much revenue Bell would require over the revenue received in the test year ended June 1979 in order that it might receive a just and reasonable return. The Commission found

1. The services offered by Bell are likely to be changed radically by reason of the separation of American Telephone and Telegraph Company ("AT & T") from its subsidiaries under the antitrust settlement recently approved in the federal courts.

2. A telephone "Exchange Access Arrangement" is a telephone facility that permits access to and from the customers' premises and the telephone network.

that there was a need for such additional revenue of $34,762,000. The Commission then formulated a total tariff structure, including increases to Categories one and three, under which revenues would be produced amounting to $37,669,000.[3] The excess of $2,907,000 was then to be applied as a rate reduction to Category two services. This reduction was to be allocated within the four exchanges in accordance with the Missouri Exchange Service Cost/Revenue Analysis by Rate Group for 1975 and 1976 (RGS) which had been approved in Case No. 18,309.

After making those determinations with respect to the future rate, the majority of the Commission then proceeded to adopt the amount of the reduction so obtained for the Kansas City exchange as the amount which should be refunded to subscribers in the Kansas City exchange under Case No. TR–77–214. The Commission majority opinion in this respect reads as follows: "To the extent that the rate for basic service are to be reduced in the Kansas City exchanges, the Commission finds the rates approved on an interim basis in Case No. TR–77–214 to be excessive and the excess with six percent simple interest shall be refunded to those customers paying the interim rates since March 6, 1978."

Bell objects to this refund order on a number of grounds. We need only consider the contention that this order is not supported by the evidence, because we deem that contention correct and to require reversal.

As already noted, the entire basis for the Commission's majority opinion is the determination of what was considered to be an appropriate rate for the Kansas City exchange for the period beginning March 13, 1980. The basic fault in the majority's reasoning is that the new rates established in TR–79–213 are justified solely as a future projection of what will be fair and reasonable in prospective application. The rate procedure used rested upon the concepts

expressed in Case No. 18,309, which adopted a formula by which future costs and revenues could be predicted. One of the key concepts adopted in Case No. 18,309 is that of Long-Run Incremental Analysis. That concept is so vital to the new methods for formulating rates that the order in Case No. 18,309 adopting the new approach contains a special Appendix A defining and explaining LRIA. That explanation states in part as follows: "Since LRIA deals with expected changes in future revenues and costs resulting from an anticipated change in rate schedules or in the volume of service, it is a forward-looking or prospective decision making tool."

■ Insofar as the Commission utilized the concepts of Case No. 18,309 for the purpose of establishing new rates to be effective commencing March 13, 1980, that utilization was quite justified. However, when the Commission majority attempted to apply the same formula retrospectively to a past period, it completely misapplied the concepts of Case No. 18,309. By the Commission's own statement, the purpose of the test year was to create a reasonably *expected* level of earnings, expenses and investment *"during the future period during which the rates to be determined herein will be in effect."* We agree with the attitude taken by Commissioner Fraâs in his dissenting opinion that considerations proper to prospective rate making should not be applied to reevaluate rates which were in effect in a past period.

■ There is another and even more devastating objection to the refund order. The reduction in future rates accorded to the Kansas City exchange results from: (1) what is in effect a subsidy to all local exchanges from Category one and Category three services; and (2) readjustments in rates between local exchanges in favor of the Kansas City exchange. If this reduction were to be applied to the past period, as the majority of the Commission seeks to do, Bell would not have the benefit of col-

---

**3.** The increases in tariff rates to Categories one and three were calculated pursuant to Long-Run Incremental Analysis studies (LRIA), In-cremental Unit Costs (IUC) and the Embedded Direct Cost study (EDC), all of which are concepts which were approved in Case No. 18,309.

lecting higher rates from Categories one and three, nor the higher rates to be charged from exchange classifications one, two and three, to offset the reductions accorded to the Kansas City exchange. Obviously the amount of the reduction would have to come out of the return to stockholders, thereby reducing Bell's rate of return upon investment, which was already below that which had been allowed by the Commission.

A legitimate basis for ordering a refund would exist if the Kansas City exchange had not in fact reached the level of 550,000 EAAs, or if it could be shown that the collection of the higher Group XI tariff in the Kansas City exchange would result in Bell receiving an excessive rate of return. There has never been any contention and there is no contention now that the Kansas City exchange had not reached a number of EAAs in excess of 550,000 by May 13, 1977. Public Counsel did contend that the collection of this higher rate would result in Bell receiving an excessive rate of return,[4] but that contention failed for lack of proof.

The evidence offered by both Bell and the Commission all shows that even after collecting the higher interim rates under TR–77–214, Bell still did not earn as much as the rate of return which had been allowed. This appears both from the testimony submitted by Vrooman on behalf of Bell and also from the data submitted by Shackelford on behalf of the Commission.

The closest that Public Counsel came to adducing any evidence to the contrary, was that of its expert witness Johnson who expressed the opinion that the larger local exchange groups produced earnings which exceeded the embedded direct costs incurred by those groups. This conclusion by Johnson is contrary to that reached by the studies submitted in Case No. 18,309 which reported: "In every rate group, the cost of providing exchange service exceeded exchange service revenues." The Johnson

testimony certainly was not believed by Commissioner Fraas who stated in his dissent: "The record is quite clear that Category two services, at their present rates, do not come close to recovering their embedded costs." The Commission majority also seems to accept the proposition that no local exchange provides revenues covering embedded costs; so the majority opinion states: "[A]lthough no rate group is providing revenues equal to the cost of service, the revenues from larger rate groups recover a higher percentage of the associated costs than do the revenues from smaller rate groups."

Regardless of whether the Kansas City exchange, or any exchange, earned enough under existing tariffs to pay for embedded costs, the fact is clearly established that based on its entire overall operation, Bell did not exceed its allowed rate of return even after commencing collection of the interim tariff increase. In fact, the evidence shows that Bell fell short of earning that allowed rate of return. The evidence in this case fails to show that the interim rate collected in the Kansas City exchange after March 6, 1978, exceeded what was just and reasonable for those services. The determination by the majority of the Commission to the contrary is disapproved and reversed.

## II.

### Interrogatories

During the course of the proceedings before the Commission, Public Counsel submitted interrogatories to Bell pursuant to Commission Rule 4 CSR 240–2.090 which provides that any party may cause written interrogatories to be taken in the same manner, upon and under the same conditions as in civil actions in the circuit court. Over objection, Bell was forced to answer those interrogatories. It argues that the ruling in question was improper because the rule just cited should be declared invalid.

---

4.  Public Counsel's initial objections against reclassifying the Kansas City exchange into Group XI also included the following: (1) that value of service is not a legitimate design con-

cept, and (2) that the number of EAAs delineating the distinction between Groups X and XI should be 600,000 instead of 550,000.

Bell argues that depositions and production of documents are authorized by Section 386.420–2 [5] and that pursuant to Section 386.450, Public Counsel for good cause shown may require the production of books, accounts, papers or records for examination. Bell contends that these methods of discovery provided by the statutes were intended by the legislature to be and are the exclusive methods of discovery. In support of this argument, Bell cites *National Advertising Company v. State Highway Commission,* 549 S.W.2d 536, 541 (Mo.App.1977); *Myers v. Moreno,* 564 S.W.2d 83, 87 (Mo. App.1978); and *Miller v. Whaley,* 581 S.W.2d 916, 918 (Mo.App.1979).

In *National Advertising Company,* it was held that the use of interrogatories was not authorized in proceedings for highway sign removal. The statute covering that type of proceeding provided for review under the Administrative Procedures Act, Chapter 536. The appellate court pointed out that Chapter 536 provides for depositions, subpoenas and subpoenas duces tecum, but makes no provision for interrogatories. The court held that in the absence of any provision covering interrogatories, Chapter 536 must be construed to permit only the methods enumerated. *Myers* was a review of the discharge of a civil service employee and the review was controlled by Chapter 536. It was held on the authority of *National Advertising* that there was no right of discovery by means of interrogatories. Similarly, *Miller* was a review of a policeman discharge, the review being under the Administrative Procedure Act, Chapter 536. On the authority of *National Advertising* and *Myers,* it was held that there could be no discovery except by the statutorily prescribed methods of depositions, subpoenas or subpoenas duces tecum.

All of those cases were controlled by the provisions of the Administrative Procedures Act. Unlike those cases, the present case is controlled by special statutory provisions directed solely to proceedings before the Public Service Commission. One of those special statutes is Section 386.410–1 which

provides: "All hearings before the Commission . . . shall be governed by rules to be adopted and prescribed by the commission."

Proceedings before the Public Service Commission are considerably different from and vastly more complicated than the type of proceedings involved in *National Advertising, Myers* and *Miller.* The legislature has recognized these differences by creating the special and quite detailed statutes mentioned pertaining to proceedings conducted by the Commission. The authority under Section 386.410–1 for the Commission to adopt its own rules of procedure seems to be a rather uncommon grant to an administrative agency as indicated by a computer search by use of Lexis supplemented by additional research.

■ Consideration of Section 392.210–1 lends forceful support to an interpretation of Section 386.410–1 so as to permit the Commission to adopt a rule allowing the use of interrogatories. Section 392.210–1 provides specifically with respect to telephone companies that the Commission may require specific answers to questions upon which the Commission may desire information, with a penalty of $100 per day for failure to comply. See also Section 393.140(9). Surely Public Counsel could apply to the Commission under Section 392.210–1 for an order calling upon Bell to provide specific answers to questions. Thus, Public Counsel in any event has a method whereby to get the same answers from Bell under Section 392.210–1 that it can under Regulation 4 CSR 240–2.090. · The only difference is that under the Regulation, Public Counsel is spared the time and inconvenience of filing a prior application to the Commission and the Commission is spared the time and the inconvenience of filing a prior application to the Commission and the Commission is spared the time and the inconvenience of processing a special order. The impact upon Bell of either procedure would be virtually the same.

The only purpose of Section 386.410–1 was to serve the convenience of the Com-

5. All sectional references are to RSMo 1978, unless otherwise noted.

mission and the parties before it and to expedite proceedings. That purpose will be best served by upholding Regulation 4 CSR 240–2.090.

## III.

### Accounting Issues

Bell's attack on the Commission's accounting determinations may be grouped under five headings: (a) rate of return; (b) short term construction; (c) license contract expenses; (d) flow through treatment of certain expenses; and (e) the uncollectible factor.

■ The Commission challenges consideration of any of these items on the ground that these questions have become moot. The Commission relies in this regard upon the fact that Bell has applied for and has been granted new and higher tariffs under TR–80–256 which have gone into effect under an order dated November 25, 1980. Those new tariffs have superseded the ones which are in litigation in the present proceeding. Under a considerable line of cases decided by this court, of which the most recent is *State ex rel. Missouri Pub. Serv. Co. v. Fraas,* 627 S.W.2d 882 (Mo.App.1982), the fact that new tariffs have gone into effect renders most questions concerning the former tariff moot. Although Bell argues that the mootness doctrine is incorrect and should be abandoned, we adhere to our former rulings.

■ There is, however, an exception to the mootness doctrine with respect to an issue of a recurring nature, of general public interest and importance, and which will evade appellate review unless the court exercises its discretionary jurisdiction. As stated in *State ex rel. Missouri Pub. Serv. Co. v. Fraas, supra:* "The question of whether to exercise this discretionary jurisdiction comes down to whether there is some legal principle at stake not previously ruled as to which a judicial declaration can and should be made for future guidance. If the matter in dispute is simply a question of fact dependent upon the evidence in the particular case, there is no necessity for a

declaration of legal principle such as to call the exception into play."

Each of the matters noted above touching upon accounting issues will now be examined separately to determine whether each such issue is within the general mootness rule or within the exception to that rule.

■ A. *Rate of Return.* The question of what constitutes a fair rate of return commonly arises in utility rate making cases, and the solution almost always turns on the individual facts of each particular case. The facts and factors to be considered are so diverse that a decision in one case rarely can afford binding precedent in another. *State ex rel. Mo. Public Service Co. v. Pierce,* 604 S.W.2d 623, 625–26 (Mo. App.1980). The general question as to a proper rate of return therefore falls within the general mootness rule.

Bell claims, however, that there is a special legal issue regarding rate of return in this case, centering upon the question of whether the Commission should have made an allowance for "flotation costs". This issue arises from the proposition that a utility should be permitted to earn enough money so that it can sell new stock at a price which will net the company a sum equal to the book value of that stock. Usually there are some costs involved in the sale of a new stock issue, and therefore it is generally conceded that the stock must be worth enough more than book so that the company may sell stock, pay the flotation costs, and still receive a net sum equal to book value.

In the present case the Commission majority declined to allow any flotation cost, giving as the reason that the Company had not shown by evidence that it had any plan to make any new public issue of stock within the foreseeable future. A dissenting commissioner expressed the view that whether or not Bell contemplated a new public issue is irrelevant. Bell urges that dissenting view and in addition argues that it did show that it would continue to incur the equivalent of a flotation cost for the reason that it had an existing plan which it

intended to continue of offering a plan for reinvestment of dividends, with the existing stockholders being permitted to do so at a discount of five percent from book value. No Missouri appellate court has heretofore confronted this problem. However, this issue has been decided on virtually identical facts by the Supreme Judicial Court of Maine in *New England Tel. & Tel. Co. v. Public Utilities Commission,* 448 A.2d 272 (1982). We agree with the decision in that case which held on this point as follows:

" 'Market-to-book ratio' represents the measure of how much greater the market value of the stock must be over its book value in order to prevent dilution of the investment of existing shareholders. Although NET witness Cogswell testified that a market-to-book ratio of at least 1.1 would be required, the Commission refused to provide such an adjustment. The Commission stated that it had no responsibility to provide such a margin, reasoning that it need not make a market-to-book ratio adjustment where the utility has not shown that a new public issuance of equity is likely in the immediate or near future. Since NET had presented no persuasive evidence that such a public issuance was impending or even reasonably probable in the foreseeable future, the Commission held that a market-to-book ratio adjustment was unwarranted. NET argues that the Commission erred in so holding.

. . . .

The Commission found that the evidence of record did not support the proposition that a new public issuance of equity by AT & T was likely to occur 'during the period of effectiveness of the new rates.' NET's evidence had consisted of market letters from investment analysts which, while supportive of a dilution allowance in general, did not tend to show that a public issuance of common equity by AT & T was at all imminent. Indeed, one of those market letters, dated October, 1980, concluded by saying, 'It is quite clear that the Company will do no equity financing outside of these plans [viz., a dividend reinvestment plan and an em-

ployee savings plan] in the foreseeable future.' There is no evidence in the record to suggest that the Commission knew or should have known, before it issued its decree, about the stock issuance by AT & T that actually occurred in June, 1981, a few months after the Commission rendered its decree. From this record it cannot be held as a matter of law that NET met its burden of proving that a new common equity issuance was so likely in the then foreseeable future that the Commission was required to factor a dilution allowance into its determination of AT & T's cost of equity."

Bell also claims that the Commission's Report and Order is deficient with respect to a lack of sufficient findings to show the manner in which the Commission arrived at the allowed rate of return. As already stated in this opinion, the Commission's determination of the rate of return is within the mootness doctrine and therefore is not reviewable by this court. Any question as to the sufficiency of findings to permit any such review of that point is therefore academic.

B. *Short Term Plant Under Construction.* Bell proposed that the Commission include $40,610,000 of short term construction work in progress in the rate base. The Commission declined to do so and instead required this construction work to be capitalized just as if it had been long term construction work in progress ("CWIP"). On this appeal, Bell argues that this amount should be included in the rate base because (1) the evidence was that the plant would be in service by the time of the order's effective date, and (2) inclusion would be consistent with a Federal Communication Commission ordered change in the uniform system of accounts to permit rate base inclusion of costs of projects to be completed within one year or less. No Missouri appellate court has heretofore dealt with this issue.

With respect to general CWIP, two different approaches are taken by the courts. One widely used approach is to completely exclude the present cost of CWIP from the

rate base, on the ground that rate payers receive no benefit from a new plant or facility until it is placed in service. *E.g., Bell Tel. Co. v. Public Utility Com'n.,* 47 Pa.Cmwlth. 614, 408 A.2d 917, 925–26 (Pa. Commw.1979); *State ex rel. Utilities Commission v. Morgan,* 277 N.C. 255, 177 S.E.2d 405, 416–17 (N.C.1970); *Gulf States Utilities Co. v. Louisiana, etc.,* 364 So.2d 1266, 1269–71 (La.1978). To avoid working an injustice to the utility or its investors under this approach, the utility is allowed to capitalize interest accrued in the cost of capital and construction and thus recover through depreciation its capital expenditures from future rate payers once the plant is dedicated to public service. *New Eng. T. & T. Co. v. Public Utilities Commission,* 116 R.I. 356, 358 A.2d 1, 19 (R.I.1976). This approach is dictated by statute in Missouri, but only with respect to electric utilities. Section 393.135 (Initiative Proposition No. 1).

Other jurisdictions allow a utility to include CWIP in its rate base for purpose of calculating the rate of return, especially where it appears that the property under construction will be available for use during the period in which the rates in question will be in effect. Petition of *New England Tel. & Tel. Co.,* 115 Vt. 494, 66 A.2d 135, 142 (Vt.1949); *Baltimore Gas & Electric Co. v. People's Counsel,* 220 Md. 373, 152 A.2d 825, 828–30 (Md.App.1959); *In re New England Telephone & Telegraph Co.,* 135 Vt. 527, 382 A.2d 826, 831–32 (Vt.1978); *Arizona Community Action Assn. v. Arizona Corporation Commission,* 123 Ariz. 228, 599 P.2d 184, 186–87 (Ariz.1977).

■ In the final analysis, the ultimate choice of whether to include the cost of CWIP in the rate base or to order the company to recover its costs through capitalization rests within the discretion of the regulatory agency, and so long as that choice is not shown to result in confiscation, it will be upheld on review. *Gas Serv. Co. v. State Corp. Com'n.,* 4 Kan.App.2d 623, 609 P.2d 1157, 1162–64 (1980); *Gulf State Utilities Co. v. Louisiana, etc., supra* at 1271.

■ In this case the Commission has adopted and applied an approach widely used and approved with respect to CWIP generally. The special question for consideration here is whether any reason exists to mandate different treatment where the work in progress will be completed within a short time (here within a period of four and one-half months from the end of the test period). Even though that span of time be short and the facility may be expected to be in use before the commencement of the new period for which rates are being set, nevertheless there is good reason not to include the short term construction in the rate base.

The accepted way in which to establish future rates is to select a test year upon the basis of which past costs and revenues can be ascertained as a starting point for future projection. In the case of construction work in progress, whether long term or short term, the facility has not been in use during the test year and hence no revenues from the use of that facility or reduction in expenses accruing from that facility has been reflected in the test year figures. Thus, to put into the equation the cost of those facilities without consideration of counterbalancing benefits would warp the projections. This consideration is well expressed in *New England Tel. & Tel. Co. v. Public Utilities Commission,* 448 A.2d at 294:

"It is immaterial that some of the construction work in progress is likely to be completed and go into service in the near future. A basic assumption of the test-year concept is that, over all, the test year is representative of the foreseeable future. The elements that go into the test-year computations of income and expense are not scrutinized individually to determine the degree of likelihood that particular items will recur or disappear or change in the relatively near future. To permit such scrutiny would be to make the test-year concept unworkable as a device for prediction of net revenues."

■ Nor is Bell entitled to include the short term construction in the rate base by reason of the operation of the FCC-ordered

accounting rules. Those federal rules do permit rate base inclusion of the cost of projects to be completed within one year or less. 47 C.F.R. Sec. 31.100:2. Missouri Section 392.210–2 provides that "[t]he system of accounts required [to be established and used by telephone corporations] shall follow, as nearly as may be, the system prescribed by the interstate commerce commission." Missouri Regulation 4 C.S.R. 240–30.040(3) provides that "[t]he adoption by telephone companies in Missouri of the uniform system of accounts issued by the Federal Communication Commission . . . shall in nowise bind the commission to the approval or acceptance of any item or account for the purpose of fixing rates or in determining any other matter that may come before the commission."

Under similar regulatory provisions, the Supreme Judicial Court of Maine in *New England Tel. & Tel. Co. v. Public Utilities Commission, supra,* held that the state regulatory agency was not bound to include short term plant under construction in the rate base. We agree with and adopt the ruling which appears at page 294 of that opinion:

"The Commission observes that the FCC, in making the change in the Uniform System of Accounts, expressly noted that the change was not intended to influence the intrastate rate-making decisions of state utility commissions or to impinge on their ratemaking prerogatives. FCC Report and Order, 43 Fed.Reg. 21330, 21332 (May 17, 1978). The Commission further argues that it may disregard the method by which a utility keeps its books of account, even though it may have prescribed that method, if not going beyond those books of account would result in an improper determination of rate base under the test-year concept.

Generally speaking, the Commission is not bound by a utility's books of account in setting rates . . . Although 47 C.F.R. Sec. 31.100:2, as incorporated in the Commission's regulations, may be read as requiring NET to carry short-term CWIP in rate base for accounting purposes, the Commission was justified in this case in not regarding that accounting treatment as creating an absolute substantive limitation on its determination of NET's rate base and test-year income statement.

. . . .

That NET included short-term CWIP in a rate-base account pursuant to an accounting regulation is not dispositive. As the FCC stated in its 1978 Report and Order, the change in treatment of short-term CWIP was not intended to influence the ratemaking decisions of state commissions. There is much to be said for coordinating the accounting techniques used by NET and the FCC with those employed by the Commission for ratemaking purposes, especially where the Commission prescribes those accounting methods, and it would have been wise for the Commission, at the time of adopting its Regulation 21(1)(A), to signal to telephone companies its intention with respect to future treatment of TPUC in the ratemaking process. Nevertheless, we cannot hold that the Commission arbitrarily or capriciously disregarded NET's books of account in this case."

C. *License Contract Expense.* This issue arises out of the relationship between Bell and its parent AT & T. As does each of the operating subsidiaries in the AT & T system, Bell has a license contract agreement with the parent under which it pays a percentage of its local and toll revenues less uncollectibles to the parent. Benefits received by Bell in exchange may be grouped into four categories: (1) the right to use all equipment, methods and systems covered by patents owned or controlled by AT & T, plus protection from suits charging patent infringement; (2) research and development performed by Bell Laboratories to develop and improve telephone systems; (3) advice and assistance in all matters of telephone operations; and (4) financial advice and assistance in the marketing of securities. For a history and summary of the license contract agreement scheme, see *Pacific Telephone & Telegraph Co. v. Flagg,* 189 Or. 370, 220 P.2d 522 (Or.1950).

The Commission disallowed outright the following charges under the license contract agreement: (1) AT & T's charitable and lobbying expenses (that item is not appealed); (2) a portion of the franchise tax paid to the state of New York by AT & T; (3) legal fees arising from the AT & T antitrust litigation; and (4) 50% of the "basic corporate costs" which the Commission determined would be incurred by virtue of AT & T's status as a holding company, even in the absence of any service to the subsidiary. The remaining 50% of corporate costs was allowed as relating to AT & T's role as a service company. The Commission also ordered that two portions of the license contract expenses be capitalized rather than expensed: (1) costs of research and development performed by Bell Laboratories, and (2) product development team costs billed by AT & T's General Department. The Commission further adopted its staff proposal to reduce end-of-period adjustments in an amount of $770,000 less than that proposed by Bell.

This question relating to the allowance of expenses under the AT & T contract is a new issue for the Missouri courts, but it has been the source of considerable discussion in the courts of other jurisdictions. In general, payments made by an operating telephone subsidiary of AT & T have been allowed as expenses provided the subsidiary can carry the burden of demonstrating a reasonable relationship between the charges billed and the value or benefit of services to local rate payers. *So. Cent. Bell Tel. v. La. Public Service Com'n.,* 352 So.2d 964, 979–80 (La.1977); *New England T. & T. Company v. Dept. of Pub. Util.,* 371 Mass. 67, 354 N.E.2d 860, 868 (Mass.1976); *Southwestern Bell v. State Corp. Com'n. of Kan.,* 4 Kan. App.2d 44, 602 P.2d 131, 135–36 (1980); *City of Columbus v. Public Utilities Commission,* 154 Ohio St. 107, 93 N.E.2d 693, 706–07 (1950). *See also Re Southwestern Bell Telephone Co.,* 28 P.U.R. 4th 519 (1979); *Re Mountain States Telephone & Telegraph Co.,* 29 P.U.R. 4th 97 (1978); *Re Chesapeake & P. Telephone Co. of W.Va.,* 40 P.U.R. 4th 279 (1980).

How much of the AT & T contract expenses should be regarded as reasonable is a question of fact and involves much expert judgment based upon the particular facts of a particular year. This issue therefore falls within the general mootness doctrine.

Bell claims, however, that there is presented a special legal issue here concerning the Commission's disallowance of antitrust legal fees. During the test year, AT & T was engaged in extensive antitrust litigation and allocated a portion of those expenses to each of its subsidiaries. The Commission staff requested access to certain supporting records in order to determine the reasonableness of the claimed charges and allocation. Bell declined to furnish those records on the grounds that they were protected by the attorney-client privilege. The staff thereupon recommended that the claimed antitrust expenses be disallowed because of the refusal to produce the supporting records in question. Bell now challenges the Commission's adoption of that staff recommendation.

The issue here is akin to that presented in *State ex rel. Util. Consumers Council v. Pub. Serv. Com.,* 562 S.W.2d 688, 694 (Mo. App.1978) where a utility company declined to furnish certain information on the ground that the data was entitled to protection as being "proprietary." The Eastern District of this court rejected that defense, holding:

"Though the court acknowledges that in some circumstances the proprietary nature of information may shelter it from examination, the Company here cannot hide behind the proprietary nature of the information. The Company proffered testimony and exhibits based on proprietary information. If it seeks to rely on proprietary information to carry its burden of proof and, thereby, benefit from the use of such information, then it may not protect that information from scrutiny by claiming it need not disclose. . . ."

■ We also note in passing that there is a very general consensus among public utility commissions and courts throughout the country that this attempted allocation

of antitrust expenses by AT & T to its subsidiaries is unjustified because there is a lack of benefit to the local ratepayers. *South Cent. Bell Tel. v. La. Public Service,* 373 So.2d 478 (La.1979); *New England Tel. & Tel. Co. v. Public Utilities Commission, supra; New York Tel. Co. v. Public Service Com'n.,* 64 A.D.2d 232, 410 N.Y.S.2d 124, 133 (1978); *In re Northwestern Bell Telephone Co., Pub. Util. Rep.* (CCH) Par. 23,-453 (Iowa 1981); *Re Mountain State Telephone & Telegraph Company,* 39 P.U.R. 4th 222, 242–43 (Colo.1980)'; *Re Northwestern Bell Telephone Company,* 37 P.U.R. 4th 1, 27–28 (Minn.1980); *Washington Utilities & Transportation Commission v. Pacific Northwest Bell Telephone Company,* 26 P.U.R. 4th 495, 519 (Wash.1978); *Cf.* Illinois Bell Telephone Company, Pub.Util.Rep. (CCH) Par. 23,233 (Ill.1980).

In further connection with this whole license contract expense, attention is called to the consent decree agreed upon between AT & T and the United States Department of Justice for the termination of the federal antitrust suit against AT & T. The proposed judgment would remove from the Bell System the function of supplying local telephone service by requiring AT & T to divest itself of its twenty-two local operating companies. The proposed decree was approved by the United States District Court on August 11, 1982, subject to certain specified modifications. *United States v. American Tel. & Tel. Co.,* 552 F.Supp. 131 (1982). Those modifications were accepted by AT & T on August 24, 1982. As soon as the divestiture under this new decree takes place, the whole question of license contract expenses will cease to exist.[6] This problem therefore should not be considered as being of a nature which will constantly recur in the future. This is an added reason why this issue should not be deemed as within the exception to the mootness doctrine.

D. *Flow Through As Against Normalization.* The Commission adopted flow through treatment of the tax timing differ-

ences relating to relief and pensions, social security taxes, cost of removal and salvage, and vacation pay accruals. Bell objects to that treatment and insists that the items in question should be normalized. This whole general issue had already been fully considered by this court. *State ex rel. Missouri Pub. Serv. Co. v. Fraas, supra,* at 891. A review would be purely on the factual situation presented by the evidence, and therefore falls within the general mootness doctrine.

E. *The Uncollectible Factor.* It is inevitable in the conduct of business that some charges will prove to be uncollectible. In order to give this fact consideration, the Commission adopted an uncollectible factor of .007527 resulting in an uncollectible allowance of $4,693,000. Bell had proposed an uncollectible factor of .009776, which would have produced an allowance of $6,095,000. Bell now challenges the amount of allowance by the Commission as being unrealistically low. This presents a purely factual issue and falls squarely within the general mootness doctrine.

The judgment of the circuit court is affirmed, except with respect to the matter of the Kansas City refund. As to that issue, the judgment is reversed and the order of the Commission is set aside.

All concur.

---

**6.** Under the consent decree the research and systems engineering services will continue to be provided after divestiture until September 1, 1987. However, the relationship between AT & T and the operating companies will be different after divestiture and different considerations may then become pertinent.